UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MICHAEL J. WHEELOCK SR.<br>PLAINTIFFS, ET. AL.<br><br>VS.<br><br>STATE OF RHODE ISLAND, RHODE ISLAND DEPARTMENT OF CORRECTIONS(RIDOC); CARCIERI; ASHBEL T. WALL; ROBERT McCUTCHEON; RIDOC PAROLE BOARD; LISA HOLLEY; RIDOC SEX OFFENDER TREATMENT PROGRAM; PETER LOSS; KIRK KASZYK; WILLIAM BEGONES; JOSEPH JANKOWSKI; RICHARD MEUNIER; WALTER DUFFY; LAWRENCE CERESI; SAMUEL DAVIES; MAURICE CHAMBERLAIN; CAROLYN RAMANO; RIDOC CLASSIFICATION BOARD; ROBERT FLYNN; JOHN DOE(?); AND ANY AND ALL MEMBERS OF ANY AND ALL ADMINISTRATIVE DUTIES.<br>DEFENDANTS, ET. AL. | C.A. No.__________<br><br>CA 06 366 |

I. Preliminary Statement

This cause of action is filed by a class of inmates. Who are sex offenders currently housed and serving time at the State of Rhode Island, Rhode Island Department of Corrections.

The Plaintiffs allege that the Defendants refuse to adequately administer rehabilitative services to sex offenders in their custody. Specifically, through Peter Loss' Rhode Island Department of Corrections Sex Offender Treatment Program.

The Plaintiffs will explain how the Defendants refuse to abide by law, but rather release sex offenders into society without first providing them with any rehabilitation, or making

available proper qualified individuals to provide such rehabilitation.

The plaintiffs will bring into question the SOTP intake process. Specifically, Loss' lack of qualifications to conduct it, and the misrepresentation and legality of the RIDOC SOTP, "Treatment Agreement" ("CONTRACT").

The plaintiffs will explain how Loss lacks the ability and qualifications to run the SOTP. How Loss professes an unwritten policy that there is no completion to the SOTP, and Loss continuously keeps 30-percent of the sex offenders themselves there to assist him in running the SOTP even they possess no formal training in medicine, counseling or psychological therapy.

Furthermore, the plaintiffs allege that, due to the SOTP unwritten policy there is no completion to the SOTP yet Parole Board policy states that the offender must have successfully taken part in/gone through the SOTP. The offender is therefore unable to satisfy parole guidlines and achieve parole release.

---

The plaintiff, specifically, Michael J. Wheelock,Sr., will show how the defendants warehoused him at the RIDOC Maximum Security Facility due to lack of space available at the Medium Security Facility and with total disregard for his sex offender rehabilitative needs.

Plaintiff, Wheelock, will show how defendant Loss provides evaluations/opinions to the Courts about matters such as "visitation" without conducting any personal interviews and the adverse consequences which follow. Simply to protect his own

intrests.

Plaintiff, Wheelock, will show the retaliation which has occurred as a result of redressing his complaints within the Courts.

Plaintiff, Wheelock, will further show how the Parole Board (Lisa Holley), did not hold his parole hearing in an unbiased or impartial manner.

## II. Complaint

### Section A. The Intake Process/Treatment Agreement

Defendant Loss' intake process to participate in the RIDOC SOTP currently consists of: an admission of guilt; the signing of a waiver of confidentiality; and the signing of the RIDOC SOTP, Treatment Agreement(Contract).

Plaintiffs allege Loss does not possess the medical qualifications to perform the intake process of the SOTP. This should consist of the administration of a psychological evaluation. The SOTP does not currently, nor has it previously, conducted any psychological evaluations during the intake process in order to differentiate, categorize, and provide treatment to the individual offender.

Plaintiffs allege Loss is not providing appropriate treatment within the SOTP, by profiling all sex offenders as if they have committed the same sex crimes. This creates frustration in and among the SOTP participants and acts as a barrier to effective treatment.

"The SOTP has never provided independent treatment." The SOTP places first time offenders, re-offenders, non-violent

offenders, violent offenders, offenders with single and multiple victims, offenders with male victims or female victims, offenders of children or adults together and provides a single universal treatment option. It would appear that the different attributes of these widely different types of offenses should be reflected in treatment options.

Citing, Ausman & Snyder's, Medical Library Lawyers Edition, Book 5, § 8:72, Sexual Misuse of Children, pg. 465, 466, g. Treatment, paragraph 2,

> "Many incest offenders are considered salvagable. The offending parent requires a psychological evaluation, and the spouse should be evaluated by a social worker ... Sociopaths usually are untreatable."

and; Beebe v. Heil, 2004 United States District Court for the District of Colorado LEXIS 17471 pg.5, Affirmed January 4,2006, LEXIS 7177,

> "Under Colorado law, a sex offender is required as part of his or her sentence to undergo "appropriate" treatment.
> The sex offender is further required to undergo an evaluation to determine what kind of treatment would be appropriate for him or her."

These citations support the need for psychological evaluations to categorize and provide offenders with the proper treatment consistent with thier crime.

Defendant Loss has established his own personal set of operating guidlines for the SOTP outside his official departmentally approved guidlines. Loss presents the program "Treatment Agreement" to the offender during the intake process. If the offender does not sign the Treatment Agreement, for reasons stated below, he will not receive any treatment from the SOTP.

Plaintiffs allege Loss' RIDOC SOTP Treatment Agreement, is simply a facade which allows Loss to manipulate the law so he is able to run the SOTP as he wishes.

The SOTP run by Loss is the only rehabilitation available to sex offenders within the walls of the RIDOC.

Plaintiffs allege Loss is misleading the offender during the intake process, by the signing away of all his rights secured by law. Loss presents the offender with the RIDOC SOTP Treatment Agreement. Loss then tells the offender he must sign the Treatment Agreement as a way of showing his sincerity in wanting to participate in the SOTP.

Plaintiffs allege without the offender's signature on Loss' Treatment Agreement he would not be allowed to provide treatment the way in which he currently does, which is tantamount to practicing medicine without a proper license to do so. In addition, to deny one treatment because the treatment provider lacks the ability to do so under law when there is a mandate to provide treatment is absolutely unlawful.

Plaintiffs allege Loss takes advantage of the offender when he is under duress. Loss tells the offender that if he does not sign the Treatment Agreement he will not be allowed to participate in the SOTP, receive the 3-days a month meritorious-good-time-credits the SOTP offers, visitation with your children, parole release, etc...

Plaintiffs allege Loss has deliderately designed the RIDOC SOTP Treatment Agreement, to deceive his clients into believing they are not signing a "contract" when, in fact, they are.

Plaintiffs allege it raises suspicion of Loss' intent to deceive, when the word "contract" appears hidden within the passages of the Treatment Agreement. Especially, when the word "contract" only appears hidden within the pages where you must place your signature.

Citing Blacks Law Dictionary, Eighth Edition, pg. 341, Definition of a <u>contract</u>:

> "An agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law [a binging contract].

Defendant's RIDOC SOTP Treatment Agreement, will be further referred to and known as a **"Contract."**

Plaintiffs allege that the RIDOC SOTP "Contract" is detrimental to the offenders mental and physical well-being, safety, and rehabilitative treatment.

1.) Citing, RIDIC SOTP Contract, pg. 1, paragraph 3,

> "I acknowledge that observing, confronting, and reporting <u>contract</u> violations, and monitoring and confronting other participants' general problem areas, potentially negative behavior, attitude difficulties, adjustments to prison, etc, whether in groups, classes or anywhere in the facility, are all part of recovery and promoting the control of sexual aggression and public safety. I understand that I am required to report myself or any SOTP participant who I know to be violating this agreement, or in any way may be compromising institutional or public safety. However, I will self-report or first directly confront the other member to self-report the violation. In the event I witness an SOTP member directly threaten the safety of anyone inside or outside the program, I will direct them to self-report immediately to Peter Loss and/or the Block Officer, or I will do so immediately."

Plaintiffs allege Loss calls this "Policing" others. We are not police and submit that offenders, expecting to obtain treatment and, pre-supposed, in many cases, to be unable of self-policing thier own behavior, should not be forced to act in such a capacity.

Citing, Spratt v. Wall, 2005 United States District Court for the District of Rhode Island LEXIS 33266 pg.9, Affirmed June 5,2006 LEXIS 37254,

> "It is undisputed that the prison administration's authority is compromised when inmates are given positions of authority, or preceived authority."

Plaintiffs allege the above is particularly problematic. Offenders live in an environment where the number one rule speaks against commenting on the actions or habits of one another. The danger of being known as a sex offender in a prison population is a security concern in itself, and coupled with the signing of this contract places the offender in a position of double jeopardy. The contract requirement therefore works to negate effective court mandated rehabilitative treatment. This requirement creates more serious security concerns once the offender is also labeled as a "snitch." The offender experiences internal RIDOC threats, social rejection and isolation. This has lead to depression and/or general and social anxiety disorders.

Plaintiffs allege Loss is increasing personal anxieties and the likelihood of program failure with his actions ensuring a worsening effective outcome to the program.

Plaintiffs allege Loss has placed mental and physical health

well-being, safety, and rehabilitative treatment in further jeopardy.

Plaintiffs allege Loss should not be able to force offenders to sign this contract in order to receive rehabilitation from the RIDOC SOTP.

2.) Citing, RIDOC SOTP Contract, pg.2, No.5,

> "I will cooperate with any SOTP recommended psychiatric/psychological, sex offender medication, or substance abuse evaluation. If I am found to have a legitimate major psychiatric disorder such as psychosis, a substance abuse problem, or if I am medically approved for medication for my sexual aggression problem, I will cooperate with any and all treatment necessary, including medication. I understand that I have the right to refuse medication, and acknowledge that exercising refusal may affect my participation in the SOTP. I will cooperate with any medication recommendations to gradually reduce my medication, including any suggestions by the SOTP to discuss the same with medical personnel, so that I may maximize my personal skills. I will bring suicidal plans, feelings, or intent to the attention of the SOTP and block officer immediately."

and; pg.2, No.6(c),

> "If I am already receiving psychiatric medication, I will not be involved with any other treatment staff inside or outside the A.C.I. without the approval of the SOTP. The SOTP reserves the right to terminate any contracts with other DOC treatment staff deemed counterproductive to the goals of the program. Disagreement or negative feelings about the SOTP do not constitute emergencies."

Citing, Rhode Island General Law § 23-17.13-3. Certification for Health Plans. (b) Requirements for Certification,

> "(2) Written statement of enrollee's right to seek a second opinion."
>
> "(5) Written disclosure of enrollee's right to be free from discrimination by the health plan and the right to refuse treatment without jeopardizing future treatment."

Plaintiffs allege Loss wants to have compleye control over who will provide you with psychological/psychiatric services regardless of the opinions of other medically qualified personnel. This could effectively work to allow him, as a social worker, to preempt the qualified opinion of a medical doctor.

Plaintiffs allege the above law supports Loss should not be allowed to force anyone to sign this contract and therein forfeiting their rights to have a second, medically qualified opinion, who will be the person which will provide the medical services, and what medication one will take, in order to receive treatment from the RIDOC SOTP.

3.) Citing, RIDOC SOTP Contract, pg.3, No.18,

> "I will cooperate with any and all expectations, assignments, goals, activities, or directives provided by the SOTP directly through designated instructors, group facilitators, sponsers, clerks, or other SOTP workers. I will respect all SOTP designees, and will make every effort to responsibly and directly resolve and learn from our differences."

and; pg.4, No.29,

> "Unless I am a group facilitator, sponser, clerk, or SOTP employee, I may not enter the office unless called to do so."

and; pg.5, No.39,

> "I will actively participate in group

> sessions to the satisfaction of SOTP staff, sponsers, facilitators, and other group members. I understand that participation includes talking about my behavior, and myself, confronting others, bringing up important individual and group issues, and engaging in general group discussion. If I have any important issues to raise, I am responsible for requesting group time at the start of the group."

Plaintiffs allege Loss is placing designees in positions of authority over others and creating serious security concerns.

Plaintiffs allege Loss should never be allowed to place one inmate in a position of authority over another inmate and make that inmate work to the satisfaction of the other.

Citing, Spratt v. Wall, 2005 United States District Court for the District of Rhode Island LEXIS 33266 pg.9, Affirmed June 5,2006 LEXIS 37254,

> "It is undisputed that the prison administration's authority is compromised when inmates are given positions of authority, or preceived authority."

Citing, Rhode Island General Law § 5-39.1-10. Social Worker Discipline.—Licensees subject to this chapter shall conduct their activities, services, and practice in accordance with this chapter ...,

> "(9) Assists or permits unlicensed persons under the licensee's supervision to perform services for which a license is required under this chapter."

Plaintiffs allege Loss has 72 sex offenders currently housed and in treatment at the Medium 1 Security Facility, module bravo/left. Loss has appointed approximately thirty percent of these participants, who he calls instructors, facilitators,

sponsers, clerks, or other SOTP workers, to assist him in providing rehabilitative services to the remainder of the group.

Plaintiffs allege Loss' designees are paid by and receive 2-days a month Industrial-good-time-credits from the State of Rhode Island, RIDOC to assist Loss in running the SOTP during the day, on weekends, and while on vacations. Their duties consist of, but are not limited to, providing counseling, conducting assessments/evaluations, and recommendations. These designees report their findings to Loss, who then makes treatment decisions and parole recommendations, based primarily upon their opinions. These decisions determine whether or not participants shall receive the 3-days a month Meritorious-good-time-credits the SOTP offers, remain in the SOTP, be allowed back into the SOTP, or receive a good or bad recommendation for parole release, and more. Some of Loss' designees have been in the SOTP for 10, 11, 12+ years. They are occupying precious space needed to treat others.

Plaintiffs allege by Loss keeping an individual in that environment, isolated from others, for such a length of time, is detrimental to societys safety and the individuals well-being.

Plaintiffs allege Loss' designees also have the special privileges of earning 3-days a month Meritorious-good-time-credits the SOTP offers, along with 3-dollars a day and 2-days a month Industrial-good-time-credits from the RIDOC for working for the SOTP, as well as good-time-credit for good behavior, while others are denied these rights of LIBERTY.

Plaintiffs allege Loss' desidnees move freely throughout the offices where other participant's confidential information is kept.

Citing, Rhode Island General Law § 5-39.1-10. Social Worker Discipline.—Licensees subject to this chapter shall conduct their activities, services, and practice in accordance with this chapter ...,

> "(10) Has failed to maintain confidentiality, except as required or permitted by law."

Furthermore, participants must waive confidentiality in order to give Loss' designees the right to counsel you.

Plaintiffs allege Loss' designees provide individualized treatment for SOTP participants.

Plaintiffs allege Loss will <u>not</u> provide medically qualified personnel to provide individualized treatment for one who does <u>not</u> do well, in group sessions do to their personalities, desperately tragic experiences in their past, and so on...

Plaintiffs allege Loss' designees hold <u>no</u> degrees, licenses, possess no special privilege to confidential information and are most certainly unqualified to perform duties assigned to them regularly. Loss delegates authority to these offenders (inmates) that should be the responsibility of medically licensed personnel and, in some cases, <u>authority that Loss himself should not have</u>, due to his lack of credentials in certain areas of expertise.

Plaintiffs allege Loss should <u>not</u> be able to force a program participant to sign this contract in order to receive treatment from the RIDOC SOTP, essentially forfeiting our rights to have licensed medically personnel rehabilitate us.

Plaintiffs allege Loss is <u>not</u> operating in a capacity that has the best-interests of his clients or the public in mind.

Citing, Rhode Island General Law § 5-39.1-10. Social Worker Discipline.—Licensees subject to this chapter shall conduct their activities, services, and practice in accordance with this chapter ...,

> "(1) Is incompetent to practice under the provisions of this chapter, or is found to engage in the practice of social work in a manner harmful or dangerous to a client or the public."

Citing, Rhode Island General Law § 36-14-1. Code of Ethics. Declaration of Policy.,

> "It is the policy of the State of Rhode Island that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable, responsive, avoid the appearance of impropriety, and not use their position for frivite gain or advantage."

Plaintiffs allege Loss' RIDOC SOTP "Contract" and the inadequacy of the programs treatment process is a barrier which must be "abolished" in order to promote rehabilitation, curb recidivism, and ultimately allow the program to work to ensure public safety.

## Section B. Administration of the Rhode Island Department of Corrections Sex Offender Treatment Program

Plaintiffs allege Loss has established an unwritten rule that there is no completion date for an SOTP participant.

Plaintiffs allege Loss determines how long an offender will undergo treatment. He simply sets the treatment term equal to the number of the years in the Court imposed sentence for the offense.

This means that if the Court has sentenced the offender to serve 20-years at the RIDOC, Loss will have the offender participate in the SOTP for 20-years regardless of any evaluative factors. This of course, causes many problems.

Citing, Jailhouse Lawyer's Manual, Sixth Edition (2005), Volume II., Chapter 18, pg.531,

> "Approximately 15 facilities in New York State (2nd. Cir.) currently offer sex offender counseling. It is an approximately 6-month program. Enrollees have 10-hours a week of counseling, which does not include homework, which must be done on your own time."

and; Lile v. McKune, 2002 United States District Court for the District of Kansas LEXIS 4206 (10th. Cir.) pg.4,

> "The S.A.T.P. is supported by the legitimate penological objective of rehabilitation. The S.A.T.P. lasts 18-months, involves substantial daily counseling and helps inmates address sexual addiction, understand the thoughts, feelings, and behavior dynamics that precede their offenses, and develope relapse prevention skills."

and; Neil v. Shimoda, Cite as 131 F.3d 822 (9th. Cir. 1997),

> "Each inmate in Hawaii's Sex Offender Treatment Program must undergo a twenty-five session psychoeducational treatment program in order to be eligible for parole. Inmates who are not able to participate in the program because of lack of space will be considered for parole on a case-by-case basis."

and; Ainsworth v. Risely, 2001 United States District Court for the District of New Hampshire, Affirmed LEXIS 5441 (1st. Cir.) pg.4,

> "New Hampshire State Prison sex offenders may apply for the prison's

> Sexual Offender Program(SOP), instituted in 1986. According to its mission statement the SOP seeks to "ensure community safety and protection" by preventing recidivism. The program is designed to "address sexual addiction" "help offenders understand the thoughts, feelings, and behaviors which precede their offense" and "develop relapse prevention skills." To that end, the SOP provides residential therapy to 60 inmates a year. Participants live together in a dorm and receive 10-15 hours of treatment a week for 12 to 16 months. Treatment includes community meetings, social skills training groups, and a yearlong workbook series."

Plaintiffs allege that based upon the above research treatment terms, or program goals, are set and followed. Programs to rehabilitate sex offenders seem to have completion dates ranging from 6 to 18 months in other States. Loss' RIDOC SOTP has no completion, and therein no direction, and further no true goal or objective or framework within which to operate, nor does it follow and sort of treatment plan. Loss' program simply runs open ended as a day to day operational program, and is clearly inconsistent with any other sex offender rehabilitative treatment program.

Plaintiffs allege that with no completion date to the SOTP, only 72-posistions available in the SOTP, and approximately 400-sex offenders housed at the RIDOC it is wholly impossible to provide all or even most offenders with only marginally successful rehabilitation. The way in which Loss is currently practicing sex offender rehabilitative treatment it is highly unlikely that current participants are adequately treated.

Plaintiffs allege Loss has devised a way in which to deal

with this problem and still allow him to continue to practice in the manner he does. Loss finds ludicrous, but useful, reasons to suspend an SOTP participant in favor of another and most often for reasons unrelated to medical treatment protocols or need. Appearances are created and protocols manipulated tp justify providing rehabilitative treatment to a favored offender.

Plaintiffs allege Loss couples his suspensions with a request to perform specified duties known as Suspension Assignments (written reports). The offender is told that these "assignments" are required to enable one to return to treatment within the RIDOC SOTP but are, in fact, used as a tool to help eliminate participation in the program. These "assignments" usually require the writing down and disclosure of extremely personal, sensitive and confidential information. Since the offender is not officially terminated but also not considered active in the SOTP at this time he cannot avail himself of even the meager <u>security</u> of the SOTP to keep such documentation confidential and out of another inmates possession. The offender often cannot comply, fearing for his own safety. Loss then terminates him from the RIDOC SOTP.

Plaintiffs allege that this same scenario applies to and is especially detrimental and potentially discriminatory to an offender with physical difficulties such as reading, writing, and comprehension, or one with psychological impairments such as depression, anxiety, or any other disorder.

Plaintiffs allege Loss did <u>not</u> establish a completion date to RIDOC SOTP because he would run out of offenders to treat. Loss

administers the SOTP with no completion date simply for job security without any regard for the safety of his clients or the public.

Citing, Rhode Island General Law § 36-14-1. Code of Ethics. Declaration of Policy.,

> "It is the policy of the State of Rhode Island that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable, responsive, and avoid the appearance of impropriety, and not use their position for private gain or advantage."

Plaintiffs allege Loss' administration of the RIDOC SOTP is a barrier which must be "abolished" in order to promote rehabilitation, curb recidivism, and ultimately allow the program to work to ensure public safety.

**Section C. Rhode Island Department of Corrections Sex Offender Treatment Program / Parole Board Release Guidelines**

Plaintiffs allege Loss is providing the Parole Board with a contrived, deceitful, medically inaccurate and manipulated recommendation upon which to reflect in order to grant an offender a parole release. This is due to the allegations stated within, and,

Citing, Rhode Island Parole Board Policy Statement as adopted April 26,2004, A., 11,

> "The Rhode Island Parole Board will use the following major criteria in determining whether to grant or deny parole.
> The Board will take the recommendation of the SOTP into consideration when

evaluating an inmate for potential release on parole."

Citing, Andrade v. Vose, United States District Court for the District of Rhode Island, C.A. No.96-589LO (July 18,1997),

> "Here Andrade alleges that Loss' statements interfere with his freedom of religion because Loss is requiring him to accept Loss as GOD. Loss testified that he never stated that he was Andrade's God or that he was a God, at least insofar as control over the SOTP was concerned.
>
> He further denied stating that Andrade was demented if he thought God would forgive him for his crime.
>
> Nevertheless, Andrade called as witnesses, four inmates who were participants in the SOTP and left the program, and one inmate who was still a participant. Four of the five inmates testified that Loss made the remarks about being God and the fifth inmate testified that "Loss made racial comments (e.g. "Blacks are only good for shooting basketball and kool-aid") and prevented any discussion of God in the classes."
>
> <u>I do **not** find Loss' denial as to these comments credible.</u> <u>I find that the comments testified to by Andrade and his witnesses were made by Loss during sessions of the SOTP."</u>

Thus, showing defendant Loss' unwillingness to speak the truth, and providing a deceptive account giving the Parole Board the supposed justification to warrant a denial of parole release.

Plaintiffs allege the languages contained within the parole board are extremely vague,

Citing, Rhode Island Parole Board Policy statement as adopted April 26,2004, A., 11,

> "The State of Rhode Island Parole Board will use the following major criteria in determining whether to grant or deny parole.
>
> An individual found guilty of a sexual offense will <u>not</u> generally be seriously

considered for parole until he has successfully taken part in / gone through the SOTP."

when judged in conjunction with the fact that the individual must participate in the RIDOC SOTP until released from the RIDOC.

Citing, RIDOC SOTP unwritten policy,

> "The RIDOC SOTP does not have any completion. The individual must participate in the program consistant with the appointed term equal to the Court imposed sentence for the offense and until released from the RIDOC."

Clearly the requirements of the Parole Board and the treatment regimen of the SOTP conflict and do not enable the individual to meet the criteria needed in order to achieve to parole release.

Citing, Beebe v. Heil, 2006 United States District Court for the District of Colorado LEXIS 7177 pg.6,

> "Colorado has created a scheme in which a sex offender is required to undergo treatment and in which the Colorado Department of Corrections lacks discretion to withhold treatment. The withholding of treatment, then, would work a major change in the condition of the Plaintiff's confinement since his status would change from eligible to be considered for parole to ineligible to be considered for parole. Such a change would, without doubt, have a serious impact on the prisoner's moral, outlook, hope for the future, and motivation to pursue rehabilitation. As such, there can be no serious dispute that the deprivation of treatment amounts to a grievous loss to the inmate. For this reason, I find the Plaintiff's Amended Complaint asserts allegations stating a cognizable liberty interest for due process purposes."

Plaintiffs allege Chairman of the parole Board, Lisa Holley, is holding meetings for and is an advocate for the victims of sex

crimes. We assert that this is a conflict of interests and creates a serious prejudicial outlook when considering a sex offender for parole release. When ones victim provides an impact statement to Holley, it is undisputable that she does not only base her decision on that one statement but, in the back of her mind are all the victims she has heard from as acting as an advocate.

Plaintiffs allege for reasons cited within this complaint. Offenders are refusing to enroll in the SOTP, serving out the full term of their sentence, and being released into society without the RIDOC SOTP providing them with any sex offender rehabilitation.

Plaintiffs allege defendants have conspired to create a barrier which must be "abolished" in order to promote rehabilitation, curb recidivism, and ultimately allow the program to work to ensure public safety.

Plaintiffs further allege their unable to obtain adequate treatment to ensure a correct evaluation when it comes to the determination of their custody level upon release from the RIDOC.

**Section D. Exhaustion of Remedies**

Plaintiffs allege they have exhausted all remedies at their disposal to no avail.

The State of Rhode Island Department of Corrections; State of Rhode Island Health Department; State of Rhode Island Ethics Commission; State of Rhode Island Human Rights Commission; and the State of Rhode Island Superior / Supreme Courts.

Section E. Argument / Violations of Law

<u>Rhode Island General Law</u> <u>Section-42</u>

<u>Chapter-56</u> <u>Corrections Department</u>

<u>42-56-1. Declaration of Policy</u>

(a) The Legislature finds and declares that:

(1) The State has a basic obligation to protect the public by providing institutional confinement and care of offenders and, where appropriate, treatment in the community;

(2) Efforts to rehabilitate and restore criminal offenders as law-abiding and productive members of society are essential to the reduction of crime;

(3) Upgrading of correctional institutions and rehabilitative services deserves priority consideration as a means of lowering crime rates and preventing offenders, particularly youths, first-offenders, and misdemeanants, from becoming trapped in careers of crime; and

(4) Correctional institutions and services should be so diversified in program and personnel as to facilitate individualized treatment.

(b) The purpose of this chapter is to establish a department of state government to provide for the custody, care, discipline, training, treatment, and study of persons committed to state correctional institutions or on probation or parole, so that those persons may be prepared for release, aftercare, and supervision in the community.

NOTES TO DECISIONS

1. <u>Minimum Standards</u>

This section, when read with §§ 42-56-19 and 42-56-29, creates enforceable minimum standards for the classification of state prisoners, which standards were not met by the inadequate and frequently inaccurate process used in the state prison. Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I. 1977); 639 F. Supp. 244 (D.R.I. 1986), aff'd, 616 F.2d 598 (1st. Cir.), cert. denied, 449 U.S. 839, 101 S. Ct. 115, 66 L. Ed. 2d 45 (1980).

The department of corrections failed to give effect to state policy as declared in this section, where the state prison was overcrowded, unsanitary, and unsafe; where classification of prisoners was inadequate; where prisoners lived in fear of physical attack; and where health and rehabilitative services for prisoners were either lacking or inadequately administered. Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I. 1977); 639 F.

Supp. 244 (D.R.I. 1986), aff'd, 616 F.2d 598 (1st. Cir.), cert. denied, 449 U.S. 839, 101 S. Ct. 115, 66 L. Ed. 2d 45 (1980).

**42-56-19. Educational and Vocational Training Unit**

To most effectively assist the vocational and educational rehabilitation of each person imprisoned in the adult correctional institutions or any juvenile placed in the custody of the department, there shall be within the department of corrections an educational and vocational training unit whose duties it shall be to determine the needs and the aptitude of that person and to furnish the means that shall be best designed to effect the rehabilitation.

NOTES TO DECISIONS

1. Inadequate Services

This section when read with §§ 42-56-1 and 42-56-29, creates enforceable minimum standards for the classification of state prisoners, which standards are not met by the inadequate and frequently inaccurate process used in the state prison. Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I. 1977); 639 F. Supp. 244 (D.R.I. 1986), aff'd, 616 F.2d 596 (1st. Cir.), cert. denied, 449 U.S. 839, 101 S. Ct. 115, 66 L. Ed. 2d 45 (1980).

Where health and rehabilitative services for prisoners were either lacking or inadequately administered, the department of corrections failed to meet the directive of this section. Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I. 1977); 639 F. Supp. 244 (D.R.I. 1986), aff'd, 616 F.2d 596 (1st. Cir.), cert. denied, 449 U.S. 839, 101 S. Ct. 115, 66 L. Ed. 2d 45 (1980).

**42-56-29. Receiving and Orientation Unit—Study of Incoming Prisoners**

To establish security standards which shall safe-guard society and which will provide for the most efficient possible rehabilitation of individual prisoners there shall be established within the department of corrections a receiving and orientation unit which shall receive all persons sentenced to the adult correctional institutions for a term of imprisonment of more than one year. Every person so sentenced shall be segregated for a period not to exceed thirty (30) days during which period the person shall be studied and evaluated to determine whether the person shall be a maximum, medium, or minimum security risk and to develope a program of rehabilitation, education, and medical and other care as shall be deemed necessary and appropriate to prepare the person to become a useful member of society. During the period, medical, psychometric, and psychological examination shall be made of the person and the results, together with the nature of the offense for which the person has been committed, the previous criminal history, if any, the recommendations of the

department of the attorney general and of the sentencing court and the social history shall be studied and evaluated in determining the degree of custodial care of the person, the rehabilitation program for the prison, the medical or other care that may be necessary and the spiritual and religious guidance that shall be indicated by the preference of the person.

NOTES TO DECISIONS

1. Minimum Standards Not Met

This section, when read with §§ 42-56-1 and 42-56-19, creates enforceable minimum standards for the classification of state prisoners, which standards were not met by the inadequate and frequently inaccurate process used in the state prison. Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I.1977); 639 F. Supp. 244 (D.R.I. 1986), aff'd, 616 F.2d 598 (1st. Cir.), cert. denied, 449 U.S. 839, 101 S. Ct. 115, 66 L. Ed. 2d 45 (1980).

Where health and rehabilitative services for prisoners were either lacking or inadequately adninistered, the department of corrections failed to meet the directive of this section. Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I. 1977); 639 F. Supp. 244 (D.R.I. 1986), aff'd, 616 F.2d 598 (1st. Cir.), cert. denied, 449 U.S. 839, 101 S. Ct. 115, 66 L. Ed. 2d 45 (1980).

**PALMIGIANO v. GARRAHY**

**Cite as 443 F.Supp.956(1977)**

pg. 957,

**9. Prisons** key **10**

Failure of prison officials to comply with state statutory requirements for rehabilitation and restoration of criminal offenders as law-abiding and productive members of society is actionable as a mater of state law. Gen.Laws R.I.1956, § 42-56-1.

**10. Federal Courts** key **15**

Federal district court in which federal constitutional challenge to conditions of confinement in state prison was brought had pendent jurisdiction over claim that state prison officials had not complied with state statutory requirements relating to conditions in the prison. Gen.Laws R.I.1956, §§ 42-56-1, 42-56-19, 42-56-29.

**MCKUNE v. LILE**

**SUPREME COURT OF THE UNITED STATES**

**2002 U.S. LEXIS 4206**

pg. 9,

"States have a vital interest in rehabilitating convicted sex offenders."

**BEEBE v. HEIL**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

**2006 U.S. Dist. LEXIS 7177**

pg. 6,

In his order dated August 30,2004, the district judge ruled:

Colorado has created a scheme in which a sex offender is required to undergo treatment and in which the Colorado Department of Corrections lacks discretion to withhold treatment. The withholding of treatment, then, would work a major change in the condition of Plaintiff's confinement since his status would change from eligible to be considered for parole to ineligible to be considered for parole. Such a change would, without doubt, have a serious impact on a prisoner's moral, outlook, hope for the future, and motivation to pursue rehabilitation. As such, there can be no serious dispute that the deprivation of treatment amounts to a "grievous loss" to the inmate. For this reason, I find that Plaintiff's Amended Complaint asserts allegations stating a cognizable "liberty interest for due process purposes."

and; pg. 14,

"There is a liberty interest in continued "appropriate" treatment."

**WOLFF v. McDONNELL**

**Cite as 418 U.S. 539, 94 S.Ct. 2963**

41 L.Ed. 2d pg. 936,

[8] **Constitutional Law** key **254.1**

Some kind of hearing is required at some time before a person is finally deprived of his liberty, even when the liberty itself is a statutory creation of the state. U.S.C.A.Const. Amend.14.

and; 418 U.S. *558,

[8] We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government, Dent v. West Virginia, 129 U.S.

114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889).

and; 418 U.S. *594—597,

Due process rights are required whenever an individual risks condemnation to a "grievous loss," Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed. 2d 484, revocation of parole or probation; or have a seriously adverse effect on his eligibility for parole, a risk which emphasizes the need for prior due process safeguards, Clutchette v. Procunier, 497 F.2d 809.

The decision as to whether an inmate should be allowed to confront his accusers should not be left to the unchecked and unreviewable discretion of the prison disciplinary board. The argument offered for that result is that the danger of violent response by the inmate against his accusers is great, and that only the prison administrators are in a position to weigh the necessity of secrecy in each case. But it is precisely this unchecked power of prison administrators which is the problem that due process safeguards are required to cure. 'Not only the principle of judicial review, but the whole scheme of American government, reflects an institutionalized mistrust of any such unchecked and unbalanced power over essential liberties. That mistrust does not depend on an assumption of inveterate venality or incompetence on the part of men in power . . .' Covington v. Harris, 136 U.S.App.D.C. 35, 39, 419 F.2d 617, 621. Likewise the prisoner should have the right to cross-examine adverse witness who testify at the hearing. Opposed is the view that the right might somehow undermine the proper administration of the prison, especially if accused inmates are allowed to put questions to their guards. That, however, is a view of prison administration which is outmoded and indeed anti-rehabilitative, for it supports the prevailing pattern of hostility between inmate and personnel which generates an 'inmates' code' of noncooperation, thereby preventing the rapport necessary for a successful rehabilitative program. The goal is to reintegrate inmates into society where men are supposed to be treated fairly by the government, not arbitrarily. The opposed procedure will be counterproductive. A report prepared for the Joint Commission of Correctional Manpower and Training has pointed out that the 'basic hurdle (to reintegration) is the concept of a prisoner as a nonperson and the jailer as an absolute monarch. The legal strategy to surmount this hurdle is to adopt rules . . . maximizing the prisoner's freedom, dignity, and responsibility. More particularly, the law must respond to the substantive and procedural claims that prisoners may have . . .' F. Cohen, The Legal Challenge to Corrections 65 (1969). We recognized this truth in Morrissey, where we noted that society has an interest in treating the parolee fairly in part because 'fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions of arbitrariness.' 408 U.S., at 484, 92 S.Ct. at 2602. The same priniciple applies to inmates as well.

MORRISSEY v. BREWER

Cite as U.S. L.Ed. 2d 484, 92 S.Ct. 2593

33 L.Ed. 2d 486,

**Constitutional Law § 746—due process—procedure**

8. Whether any procedural protections are due depends on the extent to which the individual will be condemned to suffer a grievous loss.

**Constitutional Law § 513—due process**

9. Under the due process clause of the Fourteenth Amendment, the question is not merely the weight of the individual's interest, but whether the nature of the interest is one within the contemplation of the "liberty or property" language of the Fourteenth Amendment.

**Constitutional Law § 746—due process—procedure**

10. Due process is flexible and calls for such procedural protections as the particular situation demands, but this does not mean that judges are at large to apply it to any and all relationships; its flexibility is in its scope once it has been determined that some process is due, and it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.

**Constitutional Law § 746—due process—procedure**

11. Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by the governmental action.

Plaintiffs assert defendants operate the Adult Correctional Institution of Rhode Island in a manner which violates clearly established Rhode Island General Laws and the substantive / procedural due process of the United States Constitutions Fourteenth Amendment.

Plaintiffs, as well as, society are suffering a grievous loss due to defendants inadequate administration of their services to sex offenders housed at the Adult Correctional Institution.

Plaintiffs assert that every allegation contained within this complaint combine to create extentive violations and every single one must be ferreted out to protect our liberty, promote rehabilitation, curb recidivism, and ultimately allow the State of Rhode Island Adult Correctional Institution to work to ensure

public safety.

**Section F. Plaintiff Wheelock Separately Alleges**

**ALLEGATION ONE**

On March 10,1999, I was ORDERED as part of my sentence to take part in a sex offender program.

On April 13,1999, I was CLASSIFIED to the Maximum Security Facility.

On May 12,1999, I was transferred from the Intake Service Center to the Maximum Security Facility where I was warehoused due to lack of space available at the Medium Security Facility.

Under Section(42) of Chapter(56) of Rhode Island General Laws and Palmigiano v. Garrahy, 443 F.Supp. 980 (1977), prison officials must give meaningful content to the policy of the Rhode Island legislature that "efforts to rehabilitate and restore criminal offenders as law-abiding and productive members of society are essential to the reduction of crime," R.I.G.L. § 42-56-1 (Supp.1976), and must obey the statutory directive, "to furnish the means as shall be best designed to effect such rehabilitation," R.I.G.L. § 42-56-19 (Supp.1976); see also R.I.G.L. § 42-56-29 (Supp.1976), and; Footnote 31. There is a plain statutory duty to make rehabilitative services available to each inmate under Rhode Island law, see R.I.G.L. § 42-56-31. and;

Morris v. Travisono, 499 F.Supp. 150 (1980), Under Rhode Island law, rehabilitation programs are required for all inmates regardless of their classification status. and;

Peter Loss, A.C.S.W.,Inc., SUMMARY OF EXPERIENCE, pg. 1,

paragraph 2, [Mr. Loss is Currently the Director of the Rhode Island Department of Corrections Sex Offender Treatment Program in Cranston, RI. Under contract, Loss administrates the Program at various security levels since 1987.]

On June 1,2000, at the Kent County Family Court. The Rhode Island Children, Youths, and Families(DCYF) was refusing to allow me visitation with my daughter, Christina Michelle Wheelock, because I was not involved in a sex offender rehabilitation program.

I assert that there was **no** sex offender rehabilitative services at the Maximum Security Facility. So I made arrangements for sex offender treatment to be performed at the Maximum Security Facility by an independent contractor. The RIDOC / RIDOC SOTP then denied me the accessibility to have an independent contractor come to the Maximum Security Facility and provide me with sex offender treatment.

The Family Court found it beyond my ability to secure sex offender treatment at the Maximum Security Facility due to no fault of my own. The Court was about to grant visitation, when DCYF requested and was granted a two week extention to show the Court good-cause why visits with Christina should not take place.

A week later DCYF contacted an independent contractor who conducted an evaluation on whether or not I was a threat to visit with Christina. At the end of the session I was told there was no reason why visits should not take place.

On June 12,2000, Mr. Loss provided DCYF with a letter that in his opinion it was my own fault I was not in the Sex Offender

Treatment Program because I was classified to the Maximum Security Facility. Mr. Loss' letter that was written for DCYF to present to the Family Court provided only misinformation and was written without conducting a personal interview with me.

On June 15,2000, I was denied visitation with Christina based on Mr. Loss' letter.

Mr. Loss' letter further lead to the denial of visitation with my son, Michael Joseph Wheelock,Jr., through divorce proceedings, and the termination of my parental rights with Christina.

Wheelock alleges the defendants failed to uphold their statutory duty under Rhode Island law, to make rehalilitative services available to him regardless of his classification status.

Wheelock alleges Mr. Loss was in violation of his contract with the State of Rhode Island Department of Corrections because he was not providing sex offender rehabilitation at the Maximum Security Facility.

Wheelock alleges Mr. Loss provided an evaluation/opinion of him without conducting a personal interview, to ensure the report and the information contained within was correct.

Wheelock alleges Mr. Loss wrote the June 12,2000, letter to simply protect his own interests.

Wheelock further alleges the defendants violations of law contained within this section have caused irreparable damages to between himself, his daughter Christina, and his son Michael,Jr.

ALLEGATION TWO

In September of 2001, I was the first of several offenders to be allowed to enroll in the first Sex Offender Treatment Program

class at the Maximum Security Facility.

During my participation in group sessions of the Program, I confronted Mr. Loss about the June 12,2000, letter he had written. Mr. Loss admitted in front of the group that he was wrong for doing so.

On May 1,2002, I was placed in segregation for placing a razor in the cell of another program participant, Mark Halverson, in hopes he would leave me alone and stop sexually harrassing me. (Halverson is openly homosexual and admitted in group sessions that he had had sexual relationships in the Intake Service Center and was having sexual relationships at the Maximum Security Facility. "Mr. Loss did nothing." Wheelock made Mr. Loss and the group well aware that he is extremely homophobic due to desperately tragic experiences in his past.)

I was sanctioned 30-days segregation, 10-days loss of earned-good-time-credits, unable to earn another 10-days good-time-credits for that month, was downgraded in status for 6-months and only allowed out of my cell in general population for 1-hour a day, loss of visits, job, its pay, and the 2-days a month Industrial-good-time-credits one receives for having a job, as well as other privileges.

Wheelock alleges if Mr. Loss did something about Halversons homosexual behavior, he would have never had this situation happen.

When I was in segregation I explained to Mr. Loss, the Deputy Warden, the Captain, the Discipline Board, and the Classification Board, how Halverson was sexually harrassing me and why I am

homophobic. That I just wanted him to leave me alone and stop making sexual remarks to me, looking in my cell all the time, following me around, and staring at me in the shower.

A few days after I was placed in segregation for this incident. Halverson was placed in segregation for admitting he was performing fellatio on another inmate.

Wheelock does not dispute that what he did was wrong, but alleges Mr. Loss could have prevented the situations which lead up to his placing the razor in Halverson's cell.

Wheelock alleges he seriously disputes Mr. Loss suspending him from the Program for 18-months and not doing anything to Halverson.

Wheelock alleges Mr. Loss showed favoritism toward Halverson, for whatever reason. Maybe because Halverson was agreeing during group sessions to allow Mr. Loss to give him medications which stop erectional function, which Mr. Loss calls, "Medical Castration." Mr. Loss said this was an experimental drug.

Wheelock alleges Mr. Loss directed Halverson to place Wheelock on his enemy list to manipulate the RIDOC Classification System and allow Halverson to be transferred to the Medium Security Facility. Prior to this incident, Halverson had been turned down for such a transfer.

Wheelock alleges Mr. Loss wrongfully terminated him from the program 18-months later because he was unable to complete the assignments given by Mr. Loss due to his anxiety/depression and the security of the Program.

Wheelock asserts Mr. Loss wrote a letter to the Family

Court in January of 2003, that Wheelock had been terminated from the SOTP because, in September of 2001, he deliberately placed a razor blade in the cell of another SOTP inmate, a malicious attempt to sabotage this other SOTP participant.

Wheelock alleges Mr. Loss provided the Family Court with partial information, and not the complete version of events that actually occurred. "Something that seems to be normal practice for Loss."

Wheelock alleges Mr. Loss also provided the Parole Board with this partial information as well, which they used in the determination of my parole release.

Wheeloch alleges Mr. Loss is running rampant, and causing him further irreparable damages.

Wheelock alleges there is a desperate need for due process safeguards to protect his "LIBERTY."

**ALLEGATION THREE**

On April 22,2005, at approximately 8:30pm., Lt. Duffy was called to module echo/right because my laundry bag full of my clean cloths was stolen when the laundry was passed out earlier that day, and was now found in the garbage barrel all cut up.

When Duffy showed up he told me to go lock in my room. He said he would review the cameras and take care of the problem.

At approximately 9:30pm., after everyone was locked in for the night, Duffy had a bunch of Correctional Officers tear apart the cells in module echo/right, which caused unnecessary havoc for all the inmates. There was no need for this action because my cloths were not in someones cell, they had already been found in the

garbage.

This created tension for me. I could hear others saying this is all Wheelock's fault, that mother f---in ripper.

Wheelock alleges this was Duffy's intention to display Wheelock as a problem.

On April 23,2005, at approximately 10:00. to 10:15am., in module echo/right, Block Officer Davies watched for 15-minutes, as inmate, Eric Houston, called me everything in the book that a sex offender could possibly be called. I was on the second teir at the time and Houston kept calling me down to fight, but I did not go. Houston said when I came down for chow he would get me.

[T]he Constitution requires prison officials to protect prisoners from inmate attack while in custody. Dace v. Solem, 858 F.2d 385, 388 (8th. Cir. 1988); Prison officials have a duty under the Eighth and Fourteenth Amendments to protect the prisoners from violence at the hands of other prisoners. Leonardo v. Moran, 611 F.2d 397 (1st. Cir. 1079); Prisoners right to be protected from harm by other prisoners is undisputable. Smith v. Marcantonio, 910 F.2d 500, 501 (8th. Cir. 1990).

Wheelock alleges Davies did nothing to prevent the attack which occurred an hour later. To the contrary, Davies left his post in module echo/right and went to sleep behind the wall in the control center during the lunch time mass movement.

At approximately 11:15am., I was hit in the back of the head by Houston, and immediately dropped to the floor and covered-up as I was kicked and punched by Houston over 30-times.

Wheelock alleges Davies left his post unmaned and went to

sleep behind the wall in the control center, when he had seen and heard Houston threatening Wheelock, and knew that an assault would most likely occur.

Wheelock alleges Davies could have prevented the attack if he had not left his post unmaned, because the attack occurred only feet from and in clear view of that post.

Wheelock alleges Davies was sleeping behind the wall in the control center, only feet from and in clear view of the attack and, "the events that were occurring for five minutes before the attack" if Davies had been sitting up and alert.

I was booked by Davies who said he observed me fighting with Houston.

Special Investigations Unit. Inspector Cabral, reviewed the tapes and stated he saw inmate Houston punching me. As I stated, I was hit in the head from behind, dropped to the ground and covered up. I never threw or attempted to throw a pucch at Houston. Cabral's review of the tapes supports my statements.

I was found guilty by the Chairman of the Discipline Board, Lt. Meunier, BASED ON DAVIES REPORT.

I was sanctioned 10-days segregation, 10-days loss of earned-good-time-credits, unable to earn another 10-days goog-time-credits for that month, loss of visits, job, its pay, and the 2-days a month one receives for having a job, as well as other privileges.

I filed a complaint against Davies with the Division of Internal Affairs. An investigation was conducted and pictures of module echo/right were taken to show the floor plan, clear views, etc... I never received a response to the complaint. Also when I

went to segregation on March 20,2006, the complaint I filed with the Division of Internal Affairs was stolen from my legal property.

Wheelock alleges Davies committed a Dereliction of Duty and violated the Eighth and Fourteenth Amendments by allowing the assault to occur, after having knowledge that an attack on him would most likely take place, left his post, hid behind the wall in the Control Center sleeping, and lied on a Discipline report which resulted in the loss of Wheelock's earned-good-time-credits, etc..., LIBERTY.

Meanwhile, Davies continues to sleep while on duty in the echo/right module.

Wheelock alleges this incident has given the inmates and officers at the John J. Moran Facility the "Green Light" to say and do whatever they want to him and use the excuse that he is a "Sex Offender" to do so.

Wheelock alleges Duffy, Davies, and Meunier have not only committed HATE CRIMES against him, but have created a pattern of HATE CRIMES to follow, because they allowed inmates to steal from, and attack Wheelock, while these officers punished him.

**ALLEGATION FOUR**

On May 3,2005, I was released from segregation and transferred to module fox/right.

An hour later, I was transferred from module fox/right to module bravo/right, where, Halverson, the inmate who was sexually harrassing me 3-years ago and I placed a razor in his cell for him to leave me alone, was housed. Halverson did not want me living in the same module as him. I had forgiven all, but Halverson went

around to every officer trying to get me moved.

On May 4,2005, Duffy had me transferred from module bravo/ right to the segregation unit and placed me under protective custody as an excuse for doing so.

Wheelock alleges Duffy maliciously transferred him to segregation to make him well known to inmates and officers that he was a Sex Offender and one that causes trouble as well.

I had remained under everyones radar in the John J. Moran Facility for almost 2-years prior to the incident that was escalated by Duffy on April 23,2005.

On May 6,2005, Special investigations Unit, Investigator Cabral, conducted an investigation into this matter and found no reason for me to be in segregation. I was then transferred to module alfa/left where Halverson's friend Joseph Wilson was housed. Wilson did not want me living in the same module as him either, but they weren't going to do what they had just done, again, until.

On September 6,2005, at approximately 12:30pm., I received my psychological evaluation from an independent contractor, via United States Postal Service already open.

I brought this matter to the attention of Block Officer, Auther Ferro, who said it was given to him that way.

Wheelock alleges the mail room officer (?) opened medical documentation clearly marked confidential, out of my presence.

At approximately 1:30pm., one hour after I brought this matter to Ferro's attention. I was transferred from module alfa/left to the segregation unit.

On September 9,2005, Inspector Begones booked me for MAKING

VERBAL THREATS toward two former SOTP participants, Wilson and Halverson, and POSESSING SEXUAL MATERIAL containing penetration when I am a sex offender and any type of sexual material is prohibited. These charges were false and trumped-up.

Duffy read the bookings to me and simply stated that the report was, VALID AS WRITTEN.

[T]he Constitution protects prisoners from being deprived of LIBERTY without due process of law. Wolff v. McDonnell, 418 U.S. 556; a state may create prisoners rights through the use of mandatory language. Wolff at 557; statute was written in "mandatory and unequivocal terms," including the word "SHALL." Hamm v. Latessa, 72 F.3d 947, 953 (1st. Cir. 1995); Regulations Governing Disciplinary Procedures for all inmates at the Adult Correctional Institutions, State of Rhode Island. There are five MANDATORY steps. Step II. Investigation and review by superior officer, section ( B.) A superior officer "SHALL" with dispatch and under any circumstances no later than one day after filing the charge, orally inform the inmate of the charge against him. ( C.) The superior officer "SHALL" conduct a preliminary investigation of the matter without unnecessary delay. The investigation will include interviews with the reporting employee, the inmate charged, and any other employee or inmates indicated. ( D.) The superior officer "SHALL" make a written summary of his investigation including the results of his interviews... He "SHALL" sign and submit a full report to the Associate Director...

Wheelock alleges Superior Officer Lt. Duffy did not conduct a preliminary investigation into the matter of MAKING

VERBAL THREATS toward inmates, Wilson and Halverson. Had he, he would have uncovered the simple fact that these inmates did not want him living in the same module as them and this is how they chose to deal with it.

Wheelock alleges Superior Officer Lt. Duffy did not conduct a preliminary investigation into the matter of MAKING VERBAL THREATS toward inmates, Wilson and Halverson. Even though, on May 4,2005, Duffy had transferred Wheelock from module bravo/ right to the segregation unit for the similar situation with Halverson that was investigated by Investigator Cabral of the Special Investigations Unit and found to be unfounded. This is quite troubling that Duffy could have direct knowledge of the incident, but chose to ignore it.

Wheelock alleges Superior Officer Lt. Duffy did not conduct a preliminary investigation into the matter of POSESSING SEXUAL MATERIAL. Had he, he would have found that there was no material evidence to support such an allegation.

Wheelock alleges had Duffy conducted a preliminary investigation and not simply state, VALID AS WRITTEN, Wheelock would have been released from segregation at that time and avoided sanctions imposed at the Disciplinary Hearing.

On September 13,2005, Jankowski found me guilty of both charges. He simply stated, "guilty based on investigator's report."

Wheelock alleges Jankowski found him guilty of MAKING VERBAL THREATS based on another inmates statement with no witnesses when a pattern was forming between Wheelock and Wilson/Halverson that they just did not want me to live in the same module as them.

What made one inmate more believable than the other. Especially, when my defense showed that a pattern was forming whenever I was moved into the same module as them.

Wheelock alleges Jankowski found him guilty of DISPLAYING PORNOGRAGHIC PICTURES when he was charged with POSESSING SEXUAL MATERIAL containing penetration. Said material was allegedly found while Begones searched my property in segregation after it had already been packed up by module alfa/right Block Officer Ferro. Block Officer Ferro did not book me for displaying anything.

Wheelock alleges Begones trumped-up this charge because he is a sex offender and it would look bad on his record. How could Begones allege Wheelock DISPLAYED PORNOGRAPHIC PICTURES when he never saw Wheelock's cell and no evidence was presented at the Disciplinary Hearing.

Wheelock alleges Jankowski found him guilty knowing there was no evidence presented to him at the Disciplinary Hearing.

Wheelock alleges Defendants booked him in retaliation when they received knowledge of him filing a law-suit.

Wheelock alleges Jankowski told him to put in for an out-of-state transfer to avoid any further problems. Jankowski was very assertive about it. "Wheelock took this as a threat."

I was sanctioned a combined total of 6-days loss of all privileges, 10-days segregation, 16-days loss of earned-good-time-credits, unable to earn another 10-days good-time-credits for that month, loss of visits, job, its pay, and the 2-days a month Industrial-good-time-credits one receives for having a job, as well as other privileges.

**ALLEGATION FIVE**

On September 20,2005, I was released from segregation and transferred to module echo/right where all my problems originated.

Lt. Ceresi is the Officer in charge of block to block moves. Lt. Ceresi assigned me to live in a cell with Kirk Horning. Horning labels himself as a convict and has a history of problems with sex offenders. He finds sex crimes extremely offensive. I am a sex offender.

Wheelock alleges Ceresi placed us in a cell together to get back at Horning for having argued with an officer and Wheelock for filing complaints against officers and having knowledge of him filing a law-suit.

The RIDOC has established policy 9.33 DOC, Double Occupancy of Inmate cells with criteria to ensure that double occupancy of cells be accomplished in a systematic, orderly fashion that minimizes the possibility of physical or mental harm to inmates and facilitates their safe and harmonious co-existance. The following criteria are considered when considering individuals for double occupancy celling. Decisions are based on professional judgement. The following double bunking considerations are utilized: Inmate preference should seriously be reviewed to ensure compatibility and harmony between individuals; Exhibit similar personality traits; Nature of crime, have similar offenses. This may assist in the need in avoiding protective custody, since some crimes are offensive to other inmates. The RIDOC has also established policy 3.14-1 DOC, Code of Ethics and Conduct with rules and regulations pertaining to the civil rights of offenders:

Staff "SHALL" protect the civil and legal rights of each member of the offender population; The actions and judgments of staff in the exercise of their duties which bring them into contact with the offender population "SHALL" not be influenced by personal feelings, attitudes, or prejudice towards an individual or group.

Wheelock alleges defendants placed Horning and himself together in a double-bunk cell was a conflict and a conspiracy. It is a reprisal do to him attempting to exercise his constitutional right of access to courts and do to Horning having confrontations with different officers. This was done with the intent to provoke Horning into inflicting harm upon Wheelock and, "Kill two birds with one stone."

I was supposed to be released from segregation on September 16,2005, but was not released until September 20,2005.

Wheelock alleges defendants had adequate time in which to secure proper cell placement.

In the middle of October 2005, Lenny Moore was transferred to another module. Moore and I had had an altercation in the past and all had been forgotten. We were living in the same module for three weeks before he was moved to another. Moore told me Lt. Ceresi specifically stated, "Wheelock had approached him and said Moore had threatened him." I never said any such thing to Ceresi. Furthermore, Moore has family in the module he was moved from and is well liked by Horning. As a result everyone has labeled me as a snitch and shunned me for allegedly having Moore moved. If this is disputed, then why was Moore moved?

Wheelock alleges defendants actions were intentionally

done to provoke Moore or one of his family members to assault him, and exacerbate Horning to assault him.

Horning and I fought constantly. It got so bad that I had to send a letter home describing what was going on, in case I was seriously hurt.

On October 31,2005, Lt. Meunier fired Horning from his job for harrassing sex offenders at work.

I signed up for the Spectrum Substance Abuse Program and was going to be transferred to another module within days. This would allow me to leave Hornings cell without having to snitch and be placed into protective custody.

On November 5,2005, Horning went insane. I was laying on the top bunk, when Horning jumped up and placed a pen to my throat. Horning was yelling as spit flew from his mouth. I could not move as Horning screamed at me that, "he didn't care about having to do the 18-months or 2-years state time, for sticking the pen in my neck. I want you out of this room." I explained that I should be moving any day into the Spectrum Substance Abuse Program. Horning settled down and took the pen away from my throat.

From then on, I only went into the cell during lock-down. I stayed on the top bunk and didn't move an inch. I didn't even get down to go to the bathroom. At night I had to hold it from 8:45pm. to 7:45am. (eleven hours) until Horning left the cell in the morning to go to breakfast.

On November 9,2005, I was finally transferred to another module to participate in the Spectrum Substance Abuse Program.

Except being labeled as a snitch and shunned by all, no

problems have followed me.

Wheelock alleges defendants conspired to retaliate against him for the complaints he filed against Davies(why was Wheelock placed back in Davies module after he had filed a complaint with Internal Affairs against him and why was Moore told that I said he threatened me when he is a very good friend of Davies?), and for exercising his constitutional right to the courts.

Wheelock alleges defendants intentially provoked an assault to occur by placing him in the module of an officer that he filed a complaint against with Internal Affairs, in a cell to double-bunk with a known offender who despised sex offenders, telling an inmate that Wheelock said he threatened him, firing the offender Wheelock had to double-bunk with for harrassing sex offenders, and for overall placing two inmates together in a cell to double-bunk when their incompatibility is well documented and having 16-days to accomplish this task.

Wheelock alleges defendants have caused him to suffer irreparable psychological harm and damages do to their malicious actions to provoke an assault to occur.

Wheelock alleges defendants under the Eighth and Fourteenth Amendments of the U.S. Constitution have violated his rights.

[T]he Constitution requires prison officials to protect prisoners from inmate attack while in custody. Dace v. Solem, 858 F.2d 385, 388 (8th. Cir. 1988); Prison officials have a duty under the Eighth and Fourteenth Amendments to protect prisoners from

violence at the hands of other prisoners. Leonardo v. Moran, 611 F.2d 397 (1st. Cir. 1997); Prisoners right to be protected from harm by other prisoners is indisputable. Smith v. Marcantonio, 910 F.2d 500, 501 (8th. Cir. 1990); Finding that prison officials who were familiar with the frequency and regularity of violence in a penitentiary yet disregarded available classification information to determine cellmate compatibility were deliberately indifferent to the increased risk of violence arising from random cell assignments. Jensen v. Clarke, 94 F.3d 1191, 1197 (8th. Cir. 1996).

## ALLEGATION SIX

On November 9,2005, I was transferred to the 6-month substance abuse program which is where I remained until removed from the program by Lt. Jankowski, and placed in segregation on March 20,2006.

On Febuary 14,2006, I handed the director of the substance abuse program, Carolyn Ramano, a discrimination complaint I wished to file with the programs base of operations in Worcestor, Massachusettes.

On Febuary 16,2006, at 8:20am., Ramano refused to give me the address in Worcestor, and told me to go see Jankowski if I wanted it.

At 8:30am., I asked Jankowski for the address. Jankowski handed me back the complaint I had handed Ramano two days earlier and told me to "Back Off." I took this as a serious threat.

Approximately 15-minutes later, Jankowski was overheard by an inmate, telling someone on the phone that he had ways of dealing with someone like Wheelock. I was now in great fear of further

retaliation.

On March 2,2006, I filed a Discrimination Complaint and a Notice with the programs base of operations in Worcestor, about Ramano denying me the ability to file the complaint and having me threatened via Jankowski.

On March 6,2006, I filed a complaint about this matter with Governor Carcieri.

On the same day I was taken, along with several other inmates, to the Intake Service Center and stood before Superior Court Justice Fortunato Jr., via video conference on this civil action complaint.

On March 11,2006, at 4:30pm., Duffy had me called to the chow hall and told me that the next time he sees me in there, he will have me taken to segregation.

On March 12,2006, at 12:30pm., Officer Chamberlin stopped me as I walked into the law library building with several other inmates. I was singled out and told to stand against the wall as he swore at me and called me every possible name in the book for five minutes. Chamberlin told me that if I came to the law library again, I would be going to segregation. Chamberlin is Jankowski's right hand man and has thrown me out of the law library on several ocassions.

On the same day I filed a complaint about this matter with Wall, Carcieri, and the Superior Court. I stopped going to eat chow when Duffy was on and to the law library when Chamberlin was on duty.

Wheelock alleges the defendants have conspired to deter him from following through with complaints of assault, threats,

discrimination, and this action.

## ALLEGATION SEVEN

On March 20,2006, at 8:30am., Jankowski transferred me from the 6-month Spectrum Substance Abuse Program to the Segregation Unit for no reason.

Wheelock alleges Jankowski transferred him to the segregation unit in retaliation for filing complaints and naming him as a defendant in this action which was filed in the Superior Court in September of 2005.

On March 21,2006, at 9:30am., Jankowski then rummaged through my property and legal files.

Wheelock alleges Jankowski rummaged through his property a day later and reveled in creating a reason for him to be in segregation and keek him there.

Wheelock alleges Jankowski trumped-up charges against him a day later, and booked him for ESCAPE, MUTINOUS ACT, and DISOBEDIENCE.

Wheelock alleges Jankowski removed him from the Program for no reason and trumped-up charges a day later after he searched Wheelock's property. Wheelock asserts that there remains the question of, why was he placed in segregation before there were any allegations against him?

Wheelock alleges Jankowski stole from his property, the discrimination complaint and notice against him for threatening Wheelock.

Wheelock alleges Jankowski trumped-up charges against him in retaliation for filing complaints/complaints agaist him and

naming him as a defendant in this action which was filed in the Superior Court in September of 2005.

On March 23,2006, I received a termination notice from the Spectrum Substance Abuse Program Supervisor stating, "Inmate Wheelock was administratively moved from the program by DOC staff, and therefore inmate will be terminated on this date." The notice further stated that I may reapply for the Program in 6-months.

On March 24,2006, at the Disciplinary Hearing, Booking #1 stated, "ESCAPE: On above date and time a search of the above named inmates property revealed altered fingernail clippers which had been modified for use as a screwdriver as well as a paperclip which was also altered at one end to resemble a smaller flathead screwdriver."

Jankowski testified that he was most concerned about the paperclip. He stated, "Meunier, remember when we used-to-have a problem with the ratchet system where a paperclip could be used to open the cuffs.

Wheelock alleges Meunier found him guilty on an issue that does-not-even-exist-anymore.

Booking #2 stated, "MUTINOUS ACT: On above time and date a search was conducted of the above named inmates property after he was brought to segregation on 3-20-06. Among items found were blank forms in the form of Complaints and a complete Case action package along with internet printouts on Mr. Peter Loss and the sex offender treatment program. Although inmate Wheelock is court ordered to the SOTP he is not participating presently in the program. These forms found are blank and have been copied for

distribution for filing against Mr. Peter Loss and the SOTP program. They appear to be a complete form of petition for legal action where the only thing needed is a name and a signiture."

Jankowski testified at the Disciplinary Hearing that he was concerned about the legal papers/civil action law suit in Wheelock's posession. He stated, "He received a phone call from the Administration that Wheelock was soliciting legal work for money."

I was not. I stated, "I wanted Meunier to produce one inmate who said any such thing."

Wheelock alleges Meunier dismissed his Fourteenth Amendment right to confront his accuser and found him guilty based on an accusation without confirmation.

Wheelock alleges Jankowski threatened him during the hearing. Jankowski stated, "Wheelock threatened him twice during the hearing."

Wheelock alleges Meunier found him guilty of these charges even though Jankowski threatened Wheelock right in front of him and how upset he was that he was a named defendant in the civil action law suit against Mr. Peter Loss and the SOTP.

Meunier found me guilty of ESCAPE and MUTINOUS ACT and threw out the DISOBEDIENCE charge. I was sanctioned a total of 50-days segregation, 50-days loss of earned-good-time-credits, unable to earn another 10-days good-time-credits for that month, loss of visits, job, its pay, and the 2-days a month Industrial-good-time-credits one receives for having a job, as well as other privileges.

On March 31,2006, my appeal to the Deputy Warden Kaszyk was denied.

On May 9,2006, I filed a Level I. Grievance stating, "On 3-20-06, at 8:30am., Lt. Jankowski transferred me to segregation for no apparent reason. He then rummaged through my legal files and personal belongings at his convience. On 3-21-2006, he booked me for ESCAPE, MUTINOUS ACT, and DISOBEDIENCE. I dispute them all. I am specifically grieving the MUTINOUS ACT booking for posessing a personal law-suit and other information pertaining to the suit which sits before the Honorable Justice Stephen J. Fortunato, Jr., and in part names Lt. Jankowski as a defendant. I believe it to be unjustifiable that Jankowski was acting alone and conducted above acts unlawfully and prejudicedly.

On May 22,2006, Deputy Warden Kaszyk answered the Level I. Grievance, stating, "Whenever an inmate is suspected of, or attempting to, step out of line, we will act to prevent this from happening. Lt. Jankowski was acting fully within the scope and power of his position by having you sent to segregation and searching your belongings. Your discipline was heard at a disciplinary hearing and by your request went to the wardens review which upheld the results of the hearing. Grievance denied."

Wheelock alleges Kaszyk handled his appeal and the Level I. Grievance creating a conflict of interest and a cover-up.

Wheelock alleges Kaszyk states, "[Whenever an inmate is suspected of stepping out of line you will act to prevent it from happening.]" He does not state what, because there was no reason to place Wheelock in segregation. Wheelock was only charged with

infractions after evidence was planted and he was already in segregation.

Wheelock alleges Kaszyk retaliated against him for redressing his grievances with him about his fellow officers and did not investigate and listen to the tapes of the Disciplinary Hearings or his answer would have been different.

On May 30,2006, Wheelock filed a Level II. Grievance stating, "I find it a curious a move that Lt. Jankowski transferred me to the segregation unit for no apparent reason when I have an active complaint filed against him in Providence Superior Court and Spèctrum Health Systems,Inc. I believe it to be of concern that Lt. Jankowski conducted this investigation personally instead of turning it over to the Special Investigations Unit. I further assert that Lt. Jankowski unlawfully and prejudicedly booked me in retaliation for posessing complaints and other papers pertaining to the complaints against him and others. As a result, I was also terminated from Spectrum.

On June 7,2006, Assistant Director Gadsen answered the Level II. Grievance, stating, "Mr. Wheelock, I have reviewed your booking, grievance statement and reports from Lieutenant Jankowski. Having done so, I am not convinced that Lieutenant Jankowski's actions to place you in segregation and search your property were the result of retaliation based on you filing a lawsuit. In fact, the evidence suggest that he received information that you were intimidating staff of the Spectrum Program. His response to place you in segregation was consistent with him receiving information that your actions were threatening. Because you have failed to

provide any proof to the contrary, your grievance is denied."

Wheelock asserts Gadsen did not bother to review all the evidence pertaining to this serious matter and remained bias and partial to whatever investigation was done.

Wheelock alleges he was never booked for nor did he intimidate or threaten any of the Spectrum staff. To the contrary, Wheelock received a termination notice from the Spectrum supervisor three days after LT. Jankowski removed him from the Program and placed him in segregation that, "Inmate Wheelock was Administratively moved from the program by DOC staff, and therefore inmate will be terminated on this date." The notice further stated I may reapply for the program in 6-months.

Wheelock asserts that there is no mention that he was terminated for intimidating or threatening anyone in the Spectrum Program.

Wheelock alleges defendants have made up this story of intimidation and threats in order to cover up that the actions were in retaliation for Wheelock filing complaints.

**ALLEGATION EIGHT**

On Febuary 22,2006, I was denied parole because I was not involved in the Rhode Island Department of Corrections Sex Offender Treatment Program.

Prior to the Parole Hearing I contacted, John P. Wincze,Ph.D., for the purpose of providing an independent evaluation of my sexual and pcychological profile and for the purpose of rendering an opinion regarding treatment recommendations.

On August 24,2005, I met with Mr. Wincze, who conducted a two

clinical interview that included the following areas of inquiry: description of offense for which I had been convicted, description of other criminal behavior, psychosexual developmental history, family history, and mental health and substance abuse history. In addition, the following test materials were administered: Static 99; Personality Disorders Questionaire (PDQ-4); and the Mental Health Section of the Derogatis Sexual Functioning Inventory (DSFI).

Wheelock alleges Wincze' evaluation is "Major Criteria" which was essential in the determination of a parole release.

Wheelock alleges Wincze' evaluation was given to the Counselor, Lisa Soderlundas, in order for her to prepare his parole package.

Wheelock alleges Wincze' evaluation was conveniently misplaced and never used by the Parole Board when determining his possibility of a parole release.

Wheelock alleges that the loss of Wincze' evaluation denied him the ability to establish he had secured post-release sex offender treatment and his need for individual therapy sessions of sex offender counseling due to tragic experiences in his past, etc... Wheelock's termination from the Rhode Island Department of Corrections Sex Offender Treatment Program was a result of desperately tragic experiences in his past resurfacing during group sessions of the program.

Wheelock alleges Lisa Holley, Chairperson of the State of Rhode Island Department of Corrections Parole Board, became furious and began screaming at him when he had had an indepentent evaluation conducted. Holley said she was filing a complaint against Wincze

for conducting this evaluation.

Wheelock alleges that for these reasons his Parole Hearing was not conducted in an unbiased or impartial manner.

**ALLEGATION NINE**

Since 1999, I have been attempting to secure individual sex offender counseling, to no avail.

Wheelock alleges defendants refuse to provide him with individual sex offender therapy.

Wheelock alleges defendants have denied him the ability to have an independent contractor come to the prison and provide him with individual sex offender therapy.

On May 6,2006, Kendra Capalbo,MSW, had me sign a contract, that had to be approved by the Director of Mental Health Care Services, Dr. Friedman, stating, "I, Michael Wheelock, understand that although I might discuss issues of my crime(s) in individual therapy sessions with Kendra Capalbo,MSW, this therapy will not fulfill any recommendations by either the Court or Parole Board in regard to my attending sex offender treatment."

Wheelock alleges defendants remain adamant about providing individual sex offender therapy.

Wheelock alleges defendants would rather release sex offenders into society without treatment, than to provide individual therapy.

Wheelock alleges the signing of the contract stated above further supports his inability to secure treatment to satisfy parole guidlines.

## ALLEGATION TEN

On July 6,2006, I filled out and sent four Bureau of Criminal Investigation(BCI) Visit List Forms to BCI/NCIC Coordinator, Lieutenant Flynn, at my ex-wifes request.

I filled out one for my son, Michael Joseph Wheelock Jr., my daughter, Christina Michelle Wheelock, my ex-wife, Jaime Edwards, and her husband, Freddie Edwards.

On July 17,2006, I asked Lt. Flynn why the BCI's were, "denied per visitor/per order of legal parent." "DO NOT RESUBMIT."

Lt. Flynn told me he was working over at the Womens Prison, and saw a picture of Freddie Edwards(a friend of his from the service). He asked the woman in the cell why she had a picture of him on the wall. She said the picture was of her husband and then asked if he knew me, her ex-husband. She then proceeded to tell him about me.

Lt. Flynn said she was now on home-confinement. So he personally called her and asked her why I was submitting BCI's to place them on my visiting list which was contrary to their prior discussion.

Wheelock alleges Lt. Flynn did not follow protocol, but instead allowed his actions and judgments in the exercise of his duties which bring him into contact with the offender population to be influenced by personal feelings, attitudes, and prejudices toward Wheelock as a sex offender and he was not firm, fair, and consistant with his duty under Rhode Island General Law, Section-36, Chapter-14, CODE OF ETHICS, and RIDOC's POLICY 3.14-1 DOC, CODE OF ETHICS AND CONDUCT.

Wheelock alleges Lt. Flynn's unethical etiquette exacerbated his anxiety, depression, and caused him unnecessary torment.

## II. Parties

1) Plaintiff, Michael J. Wheelock,Sr., prisoner #74124, is a Rhode Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

2) Plaintiff, Neal Rancourt, prisoner #113007, is a Rhode Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

3) Plaintiff, Luis Viveiros, prisoner #121195, is a Rhode Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

4) Plaintiff, Dana Waters, prisoner #104645, is a Rhode Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

5) Plaintiff, Ernest Hazard, prisoner #103948, is a Rhode Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

6) Plaintiff, Kenneth Wilson, prisoner #110276, is a Rhode

Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

7) Plaintiff, Frederick Hebert, prisoner #45149, is a Rhode Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

8) Plaintiff, Alan Smith, prisoner #111499, is a Rhode Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

9) Plaintiff, Normand Lalumiere, prisoner #88291, is a Rhode Island resident presently incarcerated and serving time at the Adult Correctional Institute in Cranston, Providence County, Rhode Island, Medium Security, under the direct supervision and control of the State of Rhode Island Department of Corrections.

10) Plaintiff, John Doe (?). Plaintiffs, et. al.

11) Defendant, State of Rhode Island, owns and operates the Adult Correctional Institute in Cranston, Providence County, Rhode Island, and specifically the Maximum Security/John J. Moran Medium Security Facility where the plaintiffs are currently housed. The State of Rhode Island/Adult Correctional Institute is sued in its official and individual capacity.

12) Defendant, Governor Carcieri, was at all relevant

times the Overseer of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence County, Rhode Island. Overseer of the State of Rhode Island, Adult Correctional Institute, Governor Carcieri is sued in his official and individual capacity.

13) Defendant, Ashbel T. Wall, was at all relevant times the Director of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence County, Rhode Island. Director of the State of Rhode Island, Adult Correctional Institute, Ashbel T. Wall is sued in his official and individual capacity.

14) Defendant, Robert McCutcheon, was at all relevant times the Departmental Grievance Coordinator of the State of Rhode Island Adult Correctional Institute in Cranston, Providence County, Rhode Island. Assistant Director of the State of Rhode Island, Adult Correctional Institute Jake Gadsden is sued in his official and individual capacity.

15) Defendant, the Parole Board, was at all relevant times the acting Parole Board of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence County, Rhode Island. The Parole Board is sued in its official and individual capacity.

16) Defendant, Lisa Holley, was at all times the Chairperson of the Parole Board of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence county, Rhode Island. Chairperson of the Parole Board of the State of Rhode Island, Adult Correctional Institute Lisa Holley is sued in her official and individual capacity.

17) defendant, the Rhode Island Department of Corrections Sex Offender Treatment Program, was at all relevant times the only

acting Sex Offender Program of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence County, Rhode Island. The Rhode Island Department of Corrections Sex Offender Treatment Program is sued in its official and individual capacity.

18) Defendant, Peter Loss, was at all relevant times the Contractor of the Rhode Island Department of Corrections Sex Offender Treatment Program of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence County, Rhode Island. Contractor of the Rhode Island Department of Corrections Sex Offender Treatment Program, Loss, is sued in his official and individual capacity.

19) Defendant, Kirk Kaszyk, was at all relevant times the Deputy Warden of the State of Rhode Island, Adult Correctional Institute, John J. Moran Medium Security Facility in Cranston, Providence County, Rhode Island. Deputy Warden, Kaszyk, is sued in his official and individual capacity.

20) Defendant, William Begones, was at all relevant times the Investigator of the Special Investigation Unit of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence County, Rhode Island. Investigator Begones is sued in his official and individual capacity.

21) Defendant, Joseph Jankowski, was at all relevant times the Lieutenant of the John J. Moran Medium Security Facility in Cranston, Providence County, Rhode Island. Lt. Jankowski is sued in his official and individual capacity.

22) Defendant, Richard Meunier, was at all relevant times the Lieutenant of the John J. Moran Medium Security Facility in

Cranston, Providence County, Rhode Island. Lt. Meunier is sued in his official and individual capacity.

23) Defendant, Walter Duffy, was at all relevant times the Lieutenant of the John J. Moran Medium Security Facility in Cranston, Providence County, Rhode Island. Lt. Duffy is sued in his official and individual capacity.

24) Defendant, Lawrence Ceresi, was at all relevant times the Lieutenant of the John J. Moran Medium Security Facility in Cranston, Providence County, Rhode Island. Lt. Ceresi is sued in his official and individual capacity.

25) Defendant, Samuel Davies, was at all relevant times the Correctional Officer of the John J. Moran Medium Security Facility in Cranston, Providence County, Rhode Island. c/o Davies is sued in his official and individual capacity.

26) Defendant, Maurice Chamberlin, was at all relevant times the Correctional Officer of the John J. Moran Medium Security Facility in Cranston, Providence County, Rhode Island. c/o Chamberlin is sued in his official and individual capacity.

27) Defendant, Carolyn Ramano, was at all relevant times the Director of the Spectrum Health Systems Correctional Recovery Academy of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence County, Rhode Island. Director of the Spectrum Health Systems Correctional Recovery academy Ramano is sued in her official and individual capacity.

28) Defendant, the Classification Board, was at all relevant times the Classification Board of the State of Rhode Island, Adult Correctional Institute in Cranston, Providence

County, Rhode Island. The Classification Board is sued in its official and individual capacity.

29) Defendant, Robert Flynn, was at all relevant times the Lieutenant of the John J. Moran Medium Security Facility in Cranston, Providence County, Rhode Island. Lt. Flynn is sued in his official and individual capacity.

30) Defendant, John Doe (?), includes but is not limited to, any and all members of any and all administrative duties, et. al.

## III. Jurisdiction/Venue

31) This civil action is filed by the plaintiffs, as a Class, pursuant to 42 USCA 1983, 28 USCA 1331, 1343, (3) (4), and under the United States Constitution Amendments, Eighth (cruel and unusual punishment), Fourteenth (procedural and substantive due process and the equal protection clause) and Rhode Island General Laws, but not limited to, and any and all applicable rules, statutes, authorities, consent decree judgements, and remedies.

Jurisdiction is conferred upon this Court and Venue is properly laid in the United States Federal District Court for the District of Rhode Island.

## IV. Wheelock's Statement of Facts

32) On Febuary 15,1999, I was committed to the State of Rhode Island Department of Corrections(RIDOC), Intake Service Center.

33) On March 10,1999, I plead out and received a fifteen year sentence to serve out at the RIDOC. The sentence was imposed for an act that haunts my mind and for which I will be forever

remorseful; sexually assaulting my stepdaughter.

34) On May 12,1999, I was transferred from the Intake Service Center to the Maximum Security Facility where there was no sex offender rehabilitative services available.

35) On August 21,1999, and on December 15,1999, I was unable to produce a WITNESSED urine sample for drug testing and presumed to have used drugs. It has since been documented that I suffer from a social phobia, "Bashful Bladder Syndrome."

36) Between 1999 and 2000, I was in the process of securing visitation with my daughter, Christina Michelle Wheelock, through the State of Rhode Island Department of Children, Youths, and Families(DCYF), and my son, Michael Joseph Wheelock Jr., through divorce proceedings.

37) On June 1,2000, in Kent County Family Court, DCYF wanted to see me in sex offender treatment. The Court found that, since the RIDOC SOTP was not available to me at the Maximum Security Facility and the RIDOC/RIDOC SOTP refused to allow me to hire independent treatment to come into the prison and provide such rehabilitation. I would be granted visitation. DCYF asked for and was granted a two week extension to have me psychologically evaluated before visits began.

I was interviewed/evaluated by an independent source and told there was no reason I should be denied visitation.

38) On June 12,2000, Mr. Loss provided DCYF with his evaluation/opinion about me without conducting a personal interview with me.

[Loss' Summary of Experience states, "He is the Director of the

RIDOC SOTP in Cranston, RI., and under contract has been administering this program at various levels since 1987."]

As I previously stated there was no RIDOC SOTP available at the Maximum Security Facility, only Medium.

Mr. Loss also contracts with the State of Rhode Island, RIDOC to operate the RIDOC SOTP according to State of Rhode Island General Laws and Federal case law that [No inmate should be denied rehabilitative services due to their classification status.]

Therefore it was Loss' duty, beyond a doubt, to ensure I was provided with the services of the RIDOC SOTP, even though I was classified to the Maximum Security Facility.

Mr. Loss did not act in an unbiased or impartial manner toward me, nor did Loss comply with the law by denying me the availability of the RIDOC SOTP. It is my contention that Loss simply reveled in creating a reason to deny me access to the RIDOC SOTP at the Maximum and Medium Security Facilities, and therein allowing the Court to deny me visitation with my children.

Mr. Loss provided DCYF with his evaluation/opinion about me without conducting a personal interview with me. Loss only reviewed a document, without conducting an independent interview, and then simply cited a disciplinary record of drug use and fighting as a reason for me not being transferred to the Medium Security Facility which contrary to law and Loss' contract, is where the RIDOC SOTP only operated at that point in time. Loss' opinion therefore relied on an incomplete report which was used by DCYF to steer the Court toward denying visitation with Christina. This also lead the Court to follow through with terminating his parental rights with

Christina, and denying visitation with Michael Jr.

The incomplete document was not accurate and provided only misinformation. Had Loss interviewed me personally he would have uncovered the fact that it was automatically assumed that I was using drugs because I was unable to void in front of the officer assigned to watch this action. This fact is due to a medically documented psychological condition known as Bashful Bladder Syndrome. This condition has since been documented further at the RIDOC. In addition, I did not have any disciplinary record for fighting. This was a fabrication by Loss.

Mr. Loss did subsequently discuss the above issues with me in group sessions of the RIDOC SOTP and admitted what he had done to me was wrong but did not document this fact for RIDOC records. However,me and his children have suffered irreparable harm and damages due to Loss Providing the Court with what he knew at that time to be a non-qualified opinion on my status. Loss was, in fact only protecting his own interests.

39) In September of 2001, the RIDOC SOTP was initiated at the Maximum Security Facility. I was the first of several offenders to be allowed to participate.

Loss has systematically terminated all offenders who were in that first program.

40) In April of 2002, Mark Halverson, another participant in the RIDOC SOTP at the Maximum Security Facility, began verbally and sexually harassing me daily. (Halverson is an admitted homosexual).

I actively participated in the RIDOC SOTP and took the program

very seriously. I was openly participating in group sessions, which is the only treatment format available. The RIDOC SOTP does not provide individual counseling. As a result of desperately tragic experiences in my past I have become extremely homophobic, and Loss was made well aware of this fact immediately after enrolling in the RIDOC SOTP.

Halverson began following me around, looking in my cell staring at me in the shower, and openly telling everyone, Loss included, how he had sexual relations with inmates in the Intake Service Center and was having sexual relations with inmates in the Maximum Security Facility.

In May of 2002, Joseph Wilson, another participant in the RIDOC SOTP at the Maximum Security Facility, handed me a razor blade and told me to throw the blade in Halverson's cell as a way of telling him to leave me alone. I felt that in doing this it might resolve the problem and prevent Halverson from harming me. My action of throwing the blade into the cell was found out (recorded on tape) and I was placed in segregation.

I was sanctioned 30-days in segregation, 30-days loss of earned-good-time-credits, unable to earn another 10-days good-time-credits for that month, was down graded in status for 6-months and only allowed out of my cell in general population for 1-hour a day, loss of visits, job, its pay, and the 2-days industrial-good-time-credits one receives for having a job, as well as other privileges.

In addition, Loss suspended me from the RIDOC SOTP for 18-months, but took no action against Halverson for sexually

harassing me because Halverson was a favored RIDOC SOTP participant.

41) In May of 2002, 3-days after I was placed in sefregation for throwing the razor blade into Halverson's cell, Halverson was found to have performed fellatio on another inmate at the Maximum Secutiry Facility. This was an act that Loss could not cover-up or sweep away easily and Halverson was placed in segregation, and sanctioned 30-days segregation.

This further proved my allegations that Halverson was sexually harrassing inmates. I again wrote to Loss to try to make him and others aware of what was happening. Loss never suspended Halverson from the RIDOC SOTP, as he did me, despite absolute proof of Halverson's activity. Halverson was given special, preferencial treatment as I was left at the Maximum Security Facility a victom of Halverson's and Loss' deviant behavior.

42) Between September of 2001 and May of 2002, I did not receive any of the 3-days a month meritorious-good-time-credits the RIDOC SOTP offers for participation.

43) In January of 2003, I was terminated from the RIDOC SOTP for not completing suspension assignments for my own "safety."

44) On September 2003, I was transferred from the Maximum Security Facility to the Medium Security for good behavior.

45) In Febuary of 2004, I had completed one-third of my sentence and appeared before the Parole Board for my first time. I was asked if I was going back into Loss' RIDOC SOTP. I said I would think about it.

The Parole Board said, "We would like to see you again in two

years, and at that time we would also like to see you back in Loss' RIDOC SOTP."

46) In Febuary of 2004, I tried to enroll in the RIDOC SOTP again, in spite of my experiences with Loss.

Loss told me he would think about allowing me to enroll again. Loss told me I would have to complete the suspension assignments. I explained that I did not have the means to keep such information safe from others without having the security of being in the RIDOC SOTP building. Loss stated that he did not really care about my security concerns. Loss gave me a waiver of confidentiality form and a contract to sign. I took the documents and pondered my options. I was so fearful of my safety in agreeing to complete suspensin assignments and my mental health that I weighed the merits of going back into the RIDOC SOTP for a couple of months. During this time I also observed the way Loss was running the RIDOC SOTP at the Medium Security Facility. I submit that it was not in my best interests to sign Loss' RIDOC SOTP "Contract" and return to the RIDOC SOTP since Loss was running the program according to his personal dictates versus proper protocols.

47) On April 23,2005, I was assaulted by inmate Eric Houston in the day room module echo/right while Block Officer Davies slept behind the wall in the control center. I was placed in segregation and found guilty based upon Davies report that he saw me fighting.

I was sanctioned 10-days segregation, 10-days loss of earned-good-time-credits, was unable to earn another 10-days good-time-credits for that month, loss of visits, job, its pay, and the

2-days a month industrial-good-time-credits one receives for having a job, as well as other privileges.

I filed a complaint against Davies with the Division of Internal Affairs. An investigation was conducted, but I never received the outcome. Furthermore the complaint which I filed was stolen from my property by Lt. Jankowski during a search of my property on March 21,2006.

Meanwhile, Davies continues to sleep while on duty in module echo/right.

48) On May 3,2005, I was transferred from module fox/right where Halverson was housed. That day Halverson saw I was residing in his module, he approached officers in the building to create a situation to have me transferred to another module, not because anything was going on, but because of the incident in Maximum Security three and a half years ago.

49) On May 4,2005, I was transferred from module bravo/ right to the segregation unit, per order of Lt. Duffy.

Based upon the actions of Halverson, I was transferred to the segregation unit and placed under protective custody. Problems with Halverson were made worse by Loss due to his manipulations of RIDOC SOTP program protocols and disregard for properly conducted treatment regimens. The reason for my placement in segregation and being assigned protective custody was never explained. But what is clear, is that I have had many unwarrented problems with Lt. Duffy. Inspector Cabral told me that it was Lt. Duffy who ordered me placed under protective custody in segregation because of Halverson. If Halverson posed a threat to

another inmate, specifically me, he is the one who should have been placed in segregation.

Again I was left behind a victom of Halverson. I was forced to sign documents stating there was no problem with me and Halverson in order to be released from segregation.

50) On May 6,2005, I was transferred from the segregation unit to module alfa/left, where Halverson's friend Joseph Wilson was housed.

51) In June of 2005, I began putting together a civil action complaint against Mr. Loss.

52) In August of 2005, Loss returned a phone call to my mother and told her I was not in the RIDOC SOTP because I attacked another RIDOC SOTP participant with a razor blade.

53) On August 24,2005, I contacted and met with John P. Wincze, Ph.D., to be evaluated for the purposes of providing an independent evaluation of my sexual and psychological profile and for rendering an opinion regarding treatment recommendations.

John P. Wincze, Ph.D., further diagnosed me with a social phobia known as Bashful Bladder Syndrome.

54) On September 1,2005 I appeared before the Classification Board. I was asked if I would be participating, again, in the RIDOC SOTP. I said, "I have my reasons why I cannot." I further explained that I took it upon myself to be psychologically evaluated and that I had secured treatment for my psychological issues upon release. I was told to be sure to present this to the Parole Board, when I see them in Febuary of 2006.

55) On September 6,2005, at approximately 12:30pm., I

received my psychological evaluation, via United States Postal Service. It had already been opened by RIDOC staff. "Confidential" was clearly written on the envelope, and it should not have been opened out of my presence.

I brought this matter to the attention of block officer, Aurther Ferro, who passed out the mail. He said it was given to him that way. I did not file a grievance for fear of retaliation.

At approximately 1:30pm., (one-hour after my complaint to officer Ferro), I was administratively transferred to segregation and placed under investigation. No reason was given to me.

56) On September (,2005, Inspector Begones booked me for VERBALLY THREATENING (Wilson and Halverson), and for POSESSING SEXUAL MATERIAL (containing penetration.)

57) On September 9,2005, Lieutenant Duffy read these bookings to me. Lt. Duffy then simply stated, "VALID AS WRITTEN."

58) On September 13,2005, at the Disciplinary Hearing, Lt. Jankowski found me GUILTY of MAKING VERBAL THREATS towards Wilson and Halverson and GUILTY of POSESSING SEXUAL MATERIAL, Displaying Pornographic Pictures. There was absolutely no evidence presented to support these allegations. Lt. Jankowski simply stated, "VALID BASED ON INVESTIGATOR'S REPORT."

I was sanctioned 10-days segregation, 6-days loss of all privileges, 16-days loss of earned-good-time-credits, unable to earn another 10-days good-time-credits for that month, loss of visits, job, its pay, and the 2-days a month industrial-good-time-credits one receives for having a job, as well as other privileges.

I appealed the decision to Warden Walter Whitman, but the

appeals were denied.

Furthermore, during the Disciplinary Hearing, Lt. Jankowski suggested that I should apply for an out-of-state-transfer to avoid any further problems.

59) On September 20,2005, I was released from segregation 4-days late and transferred to module echo/right, which is run by Officer Davies, who I filed a Complaint against with Department of Internal Affairs.

I was placed in a cell with inmate Kirk Horning to double bunk. Horning labels himself as a convict and it was well documented that he finds sex crimes extremely offensive. As well as it is well documented that I am a sex offender. Placing me in a cell together with Horning was an extremely dangerous situation. Horning has had confrontations with different officers and made them look bad in front of others, while I am a sex offender who contacted Internal Affairs on an Officer and was invoking my constitutional rights. (Placing us together, the defendants could kill two birds with one stone without getting their hands dirty.) The defendants (Lt. Ceresi), had adequate time to secure proper cell placement for me, a total of 14-days.

In the middle of October, another inmate Lenny Moore was transferred to another module. Moore and I had an altercation in the past and all had been forgotten. After we were living in the same module for 3-weeks Moore was moved. Moore told me that Lt. Ceresi, specifically stated, "I had approached him and said I was threatened by Moore, and that is why he was moved." Moore has family in the same module and I was approached and threatened by

them. Moore is well liked by Officer Davies and Kirk Horning. I was labeled as a snitch and shunned for allegedly having Moore moved when I never said a thing. This action later exacerbated Horning to assault me.

Horning and I fought constantly. It got so bad that I had to send a letter to my family about what was going on in case I got seriously hurt, even killed.

Lt. Meunier fired Horning from his job on October 31,2005, for harrassing sex offenders at work. This now meant Horning was very upset and took it out on me.

I had signed up for the Spectrum Substance Abuse Program on October 6,2005, and was going to be transferred to another module within days. This would allow me to leave Hornings cell without having to tell on him and be placed under protective custody.

Horning went insane on November 5,2005. I was laying on the top bunk when Horning jumped up and placed a pen to my throat. Horning was yelling as spit flew from his mouth. I could not move as Horning screamed at me with the pen to my throat, "I don't care about having to do the 18-months to 2-years state time for sticking this pen in your neck." I explained that I should be moving into the drug program any day. Horning settled down and took the pen away from my throat. From then on I only went in the cell for lock-down and stayed on the top bunk and didn't move an inch. I didn't even get off the bunk to go to the bathroom. At night, I had to hold my elimination from 8:45pm. to 7:45am. (eleven hours) until Horning left the cell in the morning to go to breakfast. One night I had to sleep in my own defecation for fear of waking

Horning.

60) On November 9,2005, I was moved to module charlie/left to participate in the drug program.

Except being labeled as a snitch and shunned by all, the issues with the other inmates have subsided.

61) On November 14,2005, my uncle mails the civil action complaint to the State of Rhode Island, Providence Superior Court for filing.

62) On November 30,2005, my uncle calls Superior Court to inquire about complaint. They cannot locate complaint.

63) On December 2,2005, my uncle mails another complaint to Superior Court for filing.

64) On January 3,2006, my uncle calls Superior Court. They cannot locate complaint.

65) On January 6,2006, my uncle hand delivers another another complaint to Superior Court. They did not give a receipt.

66) On January 20,2006, my uncle goes to Superior Court to inquire about complaint. They cannot locate complaint.

Another complaint is provided and a receipt is demanded. The cover letter to the complaint is date stamped, photo-copied, and given as a receipt.

67) On January 26,2006, I mailed a personal letter to Presiding Justice of the Superior Court Joseph F. Rodgers,Jr., requesting assistance in filing complaint and the appointment of counsel.

I never received a response.

68) On Febuary 6,2006, my uncle calls Superior Court and

they cannot locate the complaint which was date stamped on January 20th.

69) On Febuary 14,2006, I handed the Director of the Spectrum Drug Program, Carolyn Ramano, a complaint about the WITNESSES urine testing procedure, I wished to file with the program's base of operations in Worcestor, Massachusettes.

70) On Febuary 16,2006, at 8:20am., Carolyn Ramano refused to give me the address to the office in Massachusettes, and told me to go see Lt. Jankowski if I wanted it.

At 8:30am., I asked Lt. Jankowski for the address as I was instructed to do by Ramano. Jankowski handed me back the complaint I had given Ramano two days earlier, and told me to "BACK OFF."

71) On Febuary 17,2006, my uncle hand delivered a complaint for filing to Senior Clerk, Pat Picano, who promised that he would personally deliver the complaint to the judge.

72) On Febuary 22,2006, I go before the Parole Board, to again, be considered for parole release.

Everything seemed to be going well, until I asked the Chairperson of the parole Board, Lisa Holley, if she would take a look at the independent psychological evaluation that was conducted by John P. Winzce Ph.D. Holley said it was not in the computer and became furious with me for having the evaluation done.

I provided Counselor, Lisa Soderlundas, with this evaluation approximately three weeks prior to the Parole Hearing, in order for her to have plenty of time to put together my parole package. It has never been explained to me why this evaluation was not included in my parole package.

I was denied parole because I was not involved in the RIDOC SOTP.

73) On March 2,2006, I mailed a complaint about having to provide WITNESSED urine samples, and a notice that Spectrum Director, Ramano, refused to give me the address in order to file a discrimination complaint and how she had me threatened, via Lt. Jankowski.

I also mailed another notice to Presiding Justice Joseph F. Rodgers,Jr., about our denial of access to the court and the need for the appointment of counsel.

74) On March 6,2006, me, Rancourt, Viveirous, Waters, Hazard, Wilson, and Hebert stood before Providence Superior Court Justice, Stephen J. Fortunato Jr., on our complaints via Video Conferencing at the Intake Service Center. Fortunato told us we would be receiving case #'s and legal counsel.

I also mailed a letter to Governor Carcieri, about being denied the ability to file a discrimination complaint and being threatened by Lt. Jankowski for trying to do so.

75) On March 7,2006, Presiding Justice of the Providence Superior Court, Joseph F. Rodgers Jr., mailed me a letter stating, "[No record of these complaints can be found]."

76) On March 8,2006, I filed a Petition for a Writ of Mandamas in the State of Rhode Island Supreme Court, directing respondents to provide me with my Constitutional Right of Access to the Court.

The Petition for a Writ of Mandamus was denied on April 28,2006, without providing any reason.

77) On March 11,2006, at 4:30pm., I was told by Lt. Duffy, the next time he see's me again in chow, I will be taken to segregation.

78) On March 12,2006, at 12:30pm., I walked into the education building with several other inmates on our way to the Law Library when Correctional Officer Chamberlin, singled me out and told me to stand against the wall and let everyone else go before me. I was then harrassed in hopes I would give him a reason to place me in segregation. Chamberlin, then threw me out of the building, and told me not to come back again or I will be going to segregation.

I filed a complaint with Wall against Duffy and Chamberlin. I did not go to eat or the Law Library anymore until after I was released from segregation on May 9,2006.

79) On March 20,2006, at 8:30am., I was transferred from Spectrum Substance Abuse Program to the Segregation Unit, per order Lt. Jankowski. My personal property was packed and my cell was given to another inmate. I was provided with no reason why I was placed in segregation.

80) On March 21,2006, Lt. Jankowski searched my property and booked me for ESCAPE, MUTINOUS ACT, and DISOBEDIENCE.

81) ON March 23,2006, I received a TERMINATION notice from the SUPERVISOR of the spectrum substance abuse program, stating, "Inmate Wheelock was administratively moved from the program by DOC staff, and therefore inmate will be terminated on this date." The notice further stated [Wheelock may apply for readmission in (6) months.]

82) On March 24,2006, I was found GUILTY by Chairperson of the Discipline Board, Lt. Meunier, of ESCAPE and MUTINOUS ACT. The DISOBEDIENCE booking was dismissed.

I was sanctioned 50-days segregation, 50-days loss of earned-good-time-credits, unable to earn another 10-days good-time-credits for that month, loss of visits, job, its pay, and the 2-days a month industrial-good-time-credits one receives for having a job, as well as other privileges.

83) On March 31,2006, I received my appeals back for ESCAPE and MUTINOUS ACT denied by Deputy Warden Kaszyk.

I also received a response from Wall stating, Deputy Hilterman will investigate my allegations about Duffy and Chamberlain, and will provide me with a written response.

I have never received a response.

84) On April 5,2006, I received Legal Mail from the Attorney Generals Office already open. I asked Correctional Officer Martineau, why he gave it to me open. Martineau said it was given to him that way.

85) On May 7,2006, I filed a Level I. Grievance. See Wheelock's allegation seven.

86) On May 22,2006, Deputy Warden Kaszyk, denied my Level I. Grievance. See Wheelock's allegation seven.

87) On May 30,2006, I filed a Level II. Grievance. See Wheelock's allegation seven.

88) On June 6,2006, I received an ORDER from the Supreme Court simply stating, "The Petition for a Writ of Mandamus is DENIED. Entered as a ORDER of this Court this 28th day of April

2006.

I received this Legal Document already open. I asked Correctional Officer Holley, why he gave it to me open. Holley said that's the way he got it.

89) On June 7,2006, the Departmental Grievance Coordinator McCutcheon, denied my Level II. Grievance. See Wheeolck's allegation seven.

90) On July 6,2006, I handed in four BCI visiting list forms to BCI/NCIC Coordinator, Lt Flynn.

91) On July 15,2006, at 12:37pm., Correctional Officer Chamberlain, denied me access to the Law Library, again. I told him Officer #1199 in module fox/right had been calling down here for me because it was not anounced if the Law Library was open. The module Officer #1199, told me to go down and see. It was open but, Chamberlain told me to get the f--- out as he sat with two other officers and watched movies on the big screen television he rolls out of the classrooms and over to his post. This is common practice for him every weekend. Shutting down the Law Library is common practice as well.

I asked for him to call Officer #1199, who would confirm that he was in fact holding me up by calling down ther for me. Chamberlain started yelling, "get the f--- out of here you f---in ripper.

Chamberlain has denied me access to the law library on numerous ocassions, as well as threatened to take his badge of, and kick my baby rippin ass.

92) On July 17,2006, I received the BCI's back from Lt.

Flynn stating, "denied per visitor/ per order of legal parent" and "DO NOT RESUBMIT."

I questioned Lt. Flynn why he wrote this, because my ex-wife is the one who told me to do it. The only he could have stated what he did, was to have personally called her on the telephone. This is when he told me he spoke with her in jail and called her on the telephone at home.

93) I have not and will not, for fear of further retaliation, file any complaints against anyone except for this one to the United States District Court For The District Of Rhode Island.

---

Plaintiff Wheelock alleges he has suffered a "Grievous Loss/Atypical and Significant Hardship."

Plaintiff Wheelock alleges he has suffered irreparable "Physical/Psychological" damages.

Plaintiff Wheelock alleges he has spent numerous days wrongfully locked up in segregation/loss of all privileges, consisting of 23-hour a day lock-down.

Plaintiff Wheelock alleges he has had numerous days of earned-good-time-credits wrongfully taken.

Plaintiff Wheelock alleges he has been wrongfully denied the ability to earn numerous days good-time-credits.

Plaintiff Wheelock alleges he has been wrongfully denied visits with his family.

Plaintiff Wheelock alleges he has been wrongfully denied the ability to work, earn a paycheck and a substantial amount of money, and numerous days of industrial-good-time-credits.

Plaintiff Wheelock alleges he has been wrongfully denied the ability to talk to his family on the telephone, recreation, receive store orders, have his television and radio, etc.

Plaintiff Wheelock alleges he has been wrongfully assualted on different occasions.

Plaintiff Wheelock alleges he has been wrongfully denied a father, daughter and son relationship.

Plaintiff Wheelock alleges he has been wrongfully tormented because he is a sex offender.

Plaintiff Wheelock alleges he has been wrongfully denied all previously outlined allegations, as listed above, but not limited to, any and all violations within that the Court deems necessary to process this complaint in the pursuit of justice.

## V. Declaratory and Injunctive Relief

1) Declare the State of Rhode Island Department of Corrections unfit and in violation of clearly established law applicable to adequately administering rehabilitative services to sex offenders in their custody.

2) Declare Loss' Rhode Island Department of Corrections Sex Offender Treatment Program unfit and in violation of clearly established law applicable to adequately administering rehabilitative services to sex offenders in the custody of and housed at the State of Rhode Island Department of Corrections.

3) Declare Loss unfit and in violation of clearly established law applicable to adequately administering rehabilitative services to sex offenders in the custody of and housed at the State of Rhode Island Department of Corrections.

4) Declare the Director of the State of Rhode Island Department of Corrections, A.T. Wall, unfit and in violation of clearly established law applicable to overseeing Loss' ability to adequately administer rehabilitative services to sex offenders through the Rhode Island Department of Corrections Sex Offender Treatment Program.

5) Order a permanet injunction enjoining Peter Loss from administering any sort of rehabilitative services to any inmate in the custody of and housed at the State of Rhode Island Department of Corrections.

6) Order a temporary injunction ordering the State of Rhode Island Department of Corrections and A.T. Wall, et. al., to establish a rehabilitative program for the rehabilitation and treatment of sex offenders in the custody of and housed at the State of Rhode Island Department of Corrections that is in compliance with the Bureau of Prisons, American Public Health Association, United States Public Health Services, and the United States Department of Health, and any other association deemed appropriate by the Court.

**Prayers for Relief**

1) Order defendants to expunge all bookings resulting from any and all matters contained within this complaint, from plaintiff's disciplinary record.

2) Order defendants to credit plaintiff any and all good-time-credits lost as a result of defendants' actions.

3) Order defendants to credit plaintiff any and all industrial/meritorous-good-time-credits lost as a result of defendants' actions.

4) Order defendants to credit the plaintiff any and all lost wages as a result of defendants' actions.

5) Order defendants to compensate all plaintiffs any and all monies used in the pursuit of this cause.

6) Order all plaintiffs compesatory and monetary damages as the Court deems appropriate.

7) Order plaintiff compensatory and monetary damages for irreparable harm suffered as a result of defendants' actions toward plaintiff affecting his physical and mental health, well-being, safety, rehabilitation, father/child relations, and termination of parental rights, as the Court deems appropriate.

Respectfully Submitted,

Dana Waters #104645

Ernest Hazard #103948

Kenneth Wilson #110276

Frederick Hebert #45149

Normand Lalumiere # 88291

Michael J. Wheelock Sr. #74124

Neal Rancourt #113007

Louis Viveiros #121195

Alan Smith #111499

John Doe (?)
Plaintiffs, et. al.